JAMES Y. MOORE, TRADING AND DOING BUSINESS AS MOORE'S DINETTE, AND GRACYE MOORE v. CITY OF CREEDMOOR, RALPH D. SEAGROVES, INDIVIDUALLY, AND AS CHIEF OF POLICE OF THE CITY OF CREEDMOOR, AND VANCE DOUGLAS HIGH, INDIVID-UALLY AND AS A COMMISSIONER OF THE CITY OF CREEDMOOR

No. 435A95

(Filed 10 February 1997)

**1. Constitutional Law § 86 (NCI4th)— dinette—public nuisance—1983 action by dinette against town—summary judgment for town—improper**

In an action arising from a dispute concerning a dinette patronized predominantly by the African-American community which functioned primarily as an eating establishment during the week and inside of which on weekends there would be dancing from 10:00 p.m. until 1:30 a.m., there was sufficient evidence to create a genuine issue of fact as to whether a constitutional violation occurred and, because the injunction against operation of the dinette was a direct result of the resolution officially adopted by the Board of Commissioners and, arguably, the moving force behind the constitutional violation, the City of Creedmoor as a municipality may be sued under 42 U.S.C. § 1983. Although a municipal government is a creation of the State, it does not have the immunity granted to the State and its agencies; local governing bodies can be sued directly under § 1983 for monetary, declaratory, or injunctive relief and summary judgment should not have been granted for defendant town on the federal constitutional claims.

**Am Jur 2d, Civil Rights §§ 16, 17, 19.**

**2. Constitutional Law § 86 (NCI4th)— dinette—nuisance injunction obtained by city—1983 action by dinette against police chief and commissioner—official capacities—summary judgment for defendants improper**

Summary judgment should not have been granted for a police chief and city commissioner in their official capacities on claims under 42 U.S.C. § 1983 arising from a dispute concerning a dinette patronized predominantly by the African-American community which functioned as an eating establishment during the week and allowed dancing on weekend nights. The only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses and the City here cannot

claim immunity. Furthermore, these claims are merely another way of bringing suit against the City.

**Am Jur 2d, Civil Rights §§ 16, 17, 19.**

3. **Constitutional Law § 115 (NCI4th)— dinette as public nuisance—complaint by dinette owner about police chief and commissioner—retaliation—free speech—section 1983 action**

Summary judgment was improperly granted for defendant police chief and defendant city commissioner in their individual capacities on claims under 42 U.S.C. § 1983 arising from a dispute concerning a dinette patronized predominantly by the African-American community which functioned as an eating establishment during the week and allowed dancing on weekend nights. The Court of Appeals erroneously applied a balancing test derived from public employer-employee cases; plaintiffs here are private citizens and there should be no balancing of competing interests with respect to their reports concerning the alleged negligence of city officials or the police department. They have a right to assert a public complaint concerning the negligence of public officials and to petition the government for redress of grievances. Where the First Amendment is implicated, any action which is taken in reckless disregard of a plaintiff's right will give rise to a section 1983 action. Based on the evidence presented, the issue of whether defendants retaliated against plaintiffs because Mr. Moore had exercised his freedom of speech is a factual issue which should be determined by a jury.

**Am Jur 2d, Civil Rights §§ 19, 20.**

4. **Constitutional Law § 86 (NCI4th)— dinette—public nuisance—section 1983 action by dinette owner—no immunity for police chief and commissioner**

Summary judgment was improperly granted for a police chief and city commissioner in an action under 42 U.S.C. § 1983 arising from a dispute concerning a dinette patronized predominantly by the African-American community which functioned as an eating establishment during the week and allowed dancing on weekend nights. Qualified immunity may protect government officials from personal liability for performing the discretionary functions of an office to the extent that such conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known. Applying this test requires a factual determination with respect to a defendant's motive, conduct, and the circumstances in which it occurred. Plaintiffs here made a showing that defendant's actions were improperly motivated and so may avoid summary judgment.

**Am Jur 2d, Civil Rights § 17.**

5. **Malicious Prosecution § 20 (NCI4th)— dinette—public nuisance—malicious prosecution—punitive damages— summary judgment for police chief**

Summary judgment was improperly granted for defendant chief of police on punitive damages arising from a malicious prosecution claim where the evidence tended to show that defendant Seagroves targeted the dinette as a trouble spot and felt that the dinette's persistent criticisms of the police department were unfounded; Seagroves led the effort to pass a parking ordinance targeted at the dinette; testimony showed that Seagroves hired and supervised an undercover agent to obtain evidence of illegal activity by plaintiffs; and Seagroves requested that the Board pass a resolution declaring the dinette a public nuisance and provided the district attorney with the incident report compiled by Seagroves. The evidence, viewed in the light most favorable to plaintiffs, presents a genuine issue of material fact as to whether actual malice existed on the part of Seagroves.

**Am Jur 2d, Malicious Prosecution § 152.**

6. **Malicious Prosecution § 17 (NCI4th)—dinette—public nuisance action—initiation of action—Supreme Court evenly divided**

Where one justice recused and the remaining justices were equally divided on the issue of whether the city or the police chief initiated the public nuisance action against plaintiffs which resulted in plaintiffs' malicious prosecution claim, the decision of the Court of Appeals is left undisturbed and stands without precedential value.

**Am Jur 2d, Appellate Review §§ 832, 859.**

Justice WHICHARD did not participate in the consideration or decision of this case.

**MOORE v. CITY OF CREEDMOOR**

[345 N.C. 356 (1997)]

Appeal by defendants pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 120 N.C. App. 27, 460 S.E.2d 899 (1995), reversing in part and affirming in part an order entered by Ellis, J., on 25 May 1993 in Superior Court, Granville County. On 8 February 1996, this Court allowed plaintiffs' petition for discretionary review of additional issues pursuant to N.C.G.S. § 7A-31. Heard in the Supreme Court 12 September 1996.

*Glenn, Mills & Fisher, P.A., by Stewart W. Fisher, for plaintiff-appellants and -appellees.*

*McDaniel & Anderson, L.L.P., by William E. Anderson and Marcia N. Southerland, for defendant-appellants and -appellees.*

*Smith, Follin & James, L.L.P., by Seth R. Cohen, on behalf of American Civil Liberties Union Legal Foundation; and Patterson, Harkavy & Lawrence, L.L.P., by Burton Craige, on behalf of North Carolina Academy of Trial Lawyers, amici curiae.*

ORR, Justice.

This case involves a civil action which was filed seeking damages for malicious prosecution, intentional infliction of emotional distress, and violation of federal and state constitutional rights. Plaintiffs James Moore and Gracye Moore instituted this action in response to a nuisance abatement action which had been filed against them pertaining to the operation of their dinette. The nuisance abatement action was filed by the District Attorney for the Ninth Judicial District after the Board of Commissioners of the City of Creedmoor passed a resolution declaring that Moore's Dinette was a public nuisance.

For forty-five years, plaintiffs owned and operated Moore's Dinette in downtown Creedmoor. During the week, the dinette functioned primarily as an eating establishment patronized predominantly by the African-American community of Creedmoor. On the weekends, however, dancing would take place inside the dinette from 10:00 p.m. until 1:30 a.m. After closing, patrons of the dinette tended to congregate in the surrounding streets and parking lots. The dinette was licensed for the sale of beer, but no wine or hard liquor was sold on the premises. There were signs posted warning customers not to bring weapons or illegal drugs onto the property.

Over a period of several years, a series of events took place involving plaintiffs and the City of Creedmoor which eventually resulted in the filing of this action by the plaintiffs. The events can be traced back to 4 November 1982, when plaintiffs applied to the Board of Commissioners of the City of Creedmoor requesting that an area surrounding their building be rezoned. The Board of Commissioners approves city ordinances and resolutions, representing the official policy of the city. Plaintiffs requested the rezoning because patrons of their dinette were being forced to park along Lyon Street because of insufficient parking in the area. However, the Board tabled the resolution, in effect denying the rezoning request.

While the rezoning request was pending, an incident occurred at the dinette involving the Creedmoor Police Department. On 29 December 1982, plaintiff James Moore called the police and requested a response to a disturbance taking place outside the dinette. Two officers responded to the fight, but allegedly, instead of breaking up the fight, they stood and watched. Mr. Moore filed an official written grievance against the Creedmoor Police Department concerning its failure to take action. After a hearing was held before a local magistrate, both officers were reprimanded and one suspended without pay.

Vance Douglas High served as a member of the Board of Commissioners of the City of Creedmoor for twelve years from December 1977 until December 1989. High was a local businessman who ran a dental fixtures factory and invested in local real estate. During his tenure on the Board of Commissioners, High voted against the zoning request made by the Moores and introduced a no-parking ordinance that prohibited all parking along the street beside Moore's Dinette. High also discussed the possibility of closing Moore's Dinette at Board meetings. For most of High's tenure on the Board, he also served as Police Commissioner for the City of Creedmoor. In 1983, High was involved in the selection of a new chief of police for the City of Creedmoor and took part in interviewing Ralph Seagroves for the position.

On 17 May 1983, defendant Ralph Seagroves became the new police chief. As police chief, Seagroves attended Board meetings and reported directly to the Board. The relationship between plaintiffs and the Creedmoor Police Department deteriorated further during Seagroves' tenure as police chief. Within a year after his job commenced, Chief Seagroves targeted the dinette as a "problem area"

because of "the traffic . . . and the street problem . . . , the fights that you have down there."

During the winter of 1983-84, Chief Seagroves hired Vernadine Clark, an African-American woman, to conduct undercover surveillance activities at various alleged "liquor houses" in Creedmoor. Clark testified at trial that Seagroves specifically instructed her to focus on Moore's Dinette and to collect evidence of illegal alcohol and drug sales. Clark further testified that during her surveillance, she was unable to find any evidence of illegal activities at Moore's Dinette and that Mr. Moore ran a strict business and would not tolerate her attempts to buy illegal drugs on the premises.

Plaintiffs continued to run their business, apparently with no major incidents, until March 1986 when the dinette was broken into and a .38-caliber handgun stolen. After making an initial police report with respect to this incident, Mr. Moore repeatedly went to the Creedmoor Police Department to inquire about the status of his stolen gun. In September 1987, the gun was recovered by authorities in Fayetteville, North Carolina. Although the Fayetteville authorities informed the Creedmoor police that they had the gun, the Creedmoor police did not ask for the return of the weapon, nor were plaintiffs notified of its recovery, and it was subsequently destroyed.

The next event occurred on 15 June 1988 when Moore's Dinette was set on fire, and "KKK" was painted on a trash bin. Although Mr. Moore called the Creedmoor Police Department to report the fire, the Fire Department was not notified until sometime later. Mr. Moore complained to Chief Seagroves concerning the slow response to the fire. Chief Seagroves testified that he considered this to be "a very unfounded complaint." The arson case was never resolved.

Following the fire, Chief Seagroves instructed his officers to make detailed written reports any time they responded to calls at Moore's Dinette. Also, more and more patrons of the dinette began to be ticketed for parking violations. On 24 January 1989, Chief Seagroves recommended at a Board meeting that the city outlaw all parking on Lyon Street. This parking ordinance was passed without notice to plaintiffs. In their complaint, plaintiffs allege the ordinance was selectively enforced, as tickets were not given on weeknights or daytime hours, but patrons were ticketed when the dinette was open for dancing on the weekends.

On 28 March 1989, Mr. Moore made a formal written complaint and an oral presentation at a regular meeting of the Board of

MOORE v. CITY OF CREEDMOOR

[345 N.C. 356 (1997)]

Commissioners concerning the alleged negligence of the Creedmoor Police Department. Specifically, Mr. Moore complained about the following four matters: (1) negligence by the chief of police and the police department in failing to return his stolen gun, (2) slow action by the police department in failing to arrest an unruly customer, (3) selective enforcement of the parking ordinance against his customers on weekends, and (4) the enforcement of a public parking ordinance on private property located on the vacant lot beside his building. Chief Seagroves testified that plaintiffs' grievance against the Creedmoor Police Department did not bother him and that he believed all of plaintiffs' criticisms were "unfounded complaints."

In July 1990, two events occurred which, according to Chief Seagroves, "finalized" his decision to request that the district attorney commence procedures to close the dinette. In the first, a driver backed his automobile into a parking lot on Main Street and collided with Chief Seagroves' vehicle. In the second, labelled a "mob scene" or "riot" by defendants, two men began fighting in a parking lot behind a pharmacy on Main Street, a crowd gathered to watch, and shots were allegedly fired into the air. It is undisputed, however, that although these two incidents occurred in an area near the dinette, they were never directly linked to plaintiffs, the dinette, or any of the dinette's patrons.

On 24 July 1990, Chief Seagroves appeared at a regular meeting of the Board of Commissioners and requested that it pass a resolution supporting legal action to close Moore's Dinette as a public nuisance. The Board passed a resolution declaring that "Moore's Dinette has been for some time and remains a public nuisance which the Board feels should be abated through the use of the laws of the State of North Carolina." Chief Seagroves then went to the district attorney, who filed a nuisance abatement action pursuant to N.C.G.S. § 19-1(b) against plaintiffs on 1 August 1990. The complaint was verified by Chief Seagroves, and two exhibits were attached to it: the resolution regarding Moore's Dinette and a list of "incidents" compiled by Chief Seagroves. That same day, Superior Court Judge Henry Hight signed a temporary restraining order enjoining plaintiffs from operating the dinette in any capacity and ordering Chief Seagroves to padlock the premises. On 10 August 1990, following a hearing, Judge Hight signed a preliminary injunction prohibiting operation of the business between the hours of 9:00 p.m. and 7:00 a.m.

The nuisance abatement trial against plaintiffs commenced on 20 March 1991. At the trial, Chief Seagroves and Officers Hughes,

**MOORE v. CITY OF CREEDMOOR**

[345 N.C. 356 (1997)]

Belvin, Humphreys, Cash, and Eudy of the Creedmoor Police Department testified against plaintiffs. They were joined by Commissioners Jenkins, Kapher, Moos, and ex-Commissioner High, among others. Plaintiffs testified on their own behalf as did one of their employees, ten of their customers, and former undercover officer Vernadine Clark. The jury deliberated ten minutes and returned a verdict finding that the operation of Moore's Dinette did not constitute a nuisance.

On 11 April 1991, Judge Robert Hobgood heard further argument with respect to the case and entered a judgment dissolving the preliminary injunction against plaintiffs and awarding them attorney's fees in the amount of $14,000, plus additional costs totalling $578.40. On 24 January 1992, plaintiffs filed the complaint in this action against the City of Creedmoor; Ralph D. Seagroves, individually and as chief of police; and Vance Douglas High, individually and as a commissioner of the City of Creedmoor. The complaint alleged four separate claims for relief: malicious prosecution; intentional infliction of emotional distress; violation of federal constitutional rights secured by the First, Fifth, and Fourteenth Amendments; and violation of state constitutional rights secured by Article I of the North Carolina Constitution. On 24 March 1992, citing occurrences subsequent to the conclusion of the nuisance action, defendant Seagroves, individually, counterclaimed against plaintiffs, alleging a new public nuisance action.

On 25 May 1993, Judge B. Craig Ellis entered a summary judgment order dismissing the action filed by plaintiffs and also dismissing the counterclaim filed by defendant Seagroves. On 24 June 1993, plaintiffs gave notice of appeal to the North Carolina Court of Appeals. On 5 September 1995, the North Carolina Court of Appeals, in a divided decision, affirmed the trial court's entry of summary judgment against plaintiffs on their claims of intentional infliction of emotional distress and violation of federal constitutional rights. However, the Court of Appeals reversed the trial court on plaintiffs' state law tort claim of malicious prosecution and remanded it for trial. The Court of Appeals also held that plaintiffs had not shown "actual malice" and therefore could not assert a claim for punitive damages.

Defendants now appeal to this Court from Judge Greene's dissent in the Court of Appeals' opinion below. Judge Greene disagreed with the majority's holding that the trial court erred in granting summary judgment for defendants Seagroves and the City of Creedmoor on the

malicious prosecution claim. In Judge Greene's opinion, defendants Seagroves and the City of Creedmoor could not be found to have "initiated" the nuisance abatement action by supplying the information to the district attorney. Because initiation is an element of a malicious prosecution claim, Judge Greene felt summary judgment was properly granted.

Additionally, on 8 February 1996, we allowed plaintiffs' petition for discretionary review of the decision of the Court of Appeals as to the following issues: (1) whether the Court of Appeals erroneously dismissed plaintiffs' claim that their First Amendment rights were violated by the police chief and a city commissioner acting in their individual capacities; (2) whether the Court of Appeals erroneously ruled that a municipality in North Carolina, and a police chief and city commissioner acting in their official capacities cannot be sued for a violation of the United States Constitution because they are not "persons" within the meaning of 42 U.S.C. § 1983; and (3) whether the Court of Appeals erred in finding that plaintiffs presented insufficient evidence of actual malice by the city, its police chief, and a city commissioner and therefore erroneously dismissed plaintiffs' claim for punitive damages.

This Court must determine whether summary judgment was properly granted as to each of plaintiffs' claims brought forward on appeal. Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (1990). It is "a drastic measure, and it should be used with caution." *Williams v. Carolina Power & Light Co.*, 296 N.C. 400, 402, 250 S.E.2d 255, 257 (1979). "When ruling on a motion for summary judgment, 'the court must look at the record in the light most favorable to the party opposing the motion.'" *Wilkes County Vocational Workshop, Inc. v. United Sleep Prods.*, 321 N.C. 735, 737, 365 S.E.2d 292, 293 (1988) (quoting *W.S. Clark & Sons, Inc. v. Union Nat'l Bank*, 84 N.C. App. 686, 688, 353 S.E.2d 439, 440, *disc. rev. denied*, 320 N.C. 177, 358 S.E.2d 70 (1987)).

## I.

[1] With respect to the issues allowed by plaintiffs' petition for discretionary review, plaintiffs first contend that the Court of Appeals erred in dismissing all of their federal constitutional claims against

the City of Creedmoor and defendants High and Seagroves in their official capacity. In the opinion below, the Court of Appeals held that a municipality and a police chief and city commissioner acting in their official capacities cannot be sued for a violation of the United States Constitution because they are not "persons" within the meaning of 42 U.S.C. § 1983. Accordingly, the court affirmed the summary judgment order entered in favor of defendants. We reverse the Court of Appeals.

In determining this issue, the Court of Appeals erroneously relied on *Corum v. University of N.C.*, 330 N.C. 761, 413 S.E.2d 276, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992). In *Corum*, this Court correctly relied on *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 105 L. Ed. 2d 45 (1989), in holding that the State of North Carolina and its agencies are not "persons" within the meaning of section 1983 and therefore could not be sued for monetary damages under that statute. In the present case, the Court of Appeals erroneously applied the holding of *Corum* to dismiss plaintiffs' claims against a municipality and its officials. Although a municipal government is a creation of the State, it does not have the immunity granted to the State and its agencies. *See Owen v. City of Independence*, 445 U.S. 622, 63 L. Ed. 2d 673 (1990).

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (1994). The United States Supreme Court, in *Monell v. Department of Social Servs.*, 436 U.S. 658, 56 L. Ed. 2d 611 (1978), overruled *Monroe v. Pape*, 365 U.S. 167, 5 L. Ed. 2d 492 (1961), and held that a municipality is a "person" within the meaning of section 1983. The United States Supreme Court stated: "Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell*, 436 U.S. at 690, 56 L. Ed. 2d at 635. *Monell* did not, however, overrule *Monroe* insofar as *Monroe* held that the doctrine of *respondeat superior* is not a basis for rendering municipalities liable

under section 1983 for constitutional torts of their employees. *Id.* at 663 n.7, 56 L. Ed. 2d at 619 n.7. Instead, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 56 L. Ed. 2d at 635. This decision was recently reaffirmed in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 122 L. Ed. 2d 517 (1993).

For a governmental entity to be liable under section 1983, the "official policy must be 'the moving force of the constitutional violation.' " *Polk County v. Dodson*, 454 U.S. 312, 326, 70 L. Ed. 2d 509, 521 (1981) (quoting *Monell*, 436 U.S. at 694, 56 L. Ed. 2d at 638). Thus, the entity's "policy or custom" must have played a part in the violation of federal law. *Monell*, 436 U.S. at 694, 56 L. Ed. 2d at 638. Further, it is well settled that a municipal entity has no claim to immunity in a section 1983 suit. *See Owen v. City of Independence*, 445 U.S. at 657, 63 L. Ed. 2d at 697.

In the present case, the City of Creedmoor adopted an official resolution to prosecute plaintiffs for creating a public nuisance. This resolution directed the police chief to make available to the district attorney the police incident reports along with other information within the knowledge of the police department concerning alleged violations which had occurred in and adjacent to the dinette. In conclusion, the resolution directed the district attorney to "proceed pursuant to the laws of the State to obtain such orders as may be appropriate to abate immediately the continued operation of the business known as Moore's Dinette as a public nuisance jeopardizing the health, safety, and well-being of the citizens and residents of the City." Thus, the action alleged to be unconstitutional by plaintiffs was a resolution officially adopted by the City of Creedmoor's governing body which resulted in the filing of the nuisance abatement action against plaintiffs.

After the resolution was passed and the nuisance abatement suit filed, an injunction was entered against plaintiffs prohibiting the operation of their dinette. This action allegedly resulted in a deprivation of plaintiffs' freedom of speech. We believe there was sufficient evidence presented to create a genuine issue of material fact as to whether a constitutional violation did in fact occur. Further, because the injunction was a direct result of the resolution officially adopted

by the Board of Commissioners of the City of Creedmoor and, arguably, the moving force behind the constitutional violation, we find that the City of Creedmoor, as a municipality, may be sued under section 1983.

[2] We now must determine whether defendants Seagroves and High may also be sued under section 1983 in their official capacities. Defendants claim that they are protected from suit under section 1983 by either qualified, judicial, or legislative immunity. However, "the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses." *Hafer v. Melo*, 502 U.S. 21, 25, 116 L. Ed. 2d 301, 309 (1991). As we have already stated above, the City of Creedmoor cannot claim immunity under section 1983, and accordingly, neither defendant Seagroves nor defendant High can claim immunity in their official capacity.

Further, official-capacity suits " 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' " *Kentucky v. Graham*, 473 U.S. 159, 165, 87 L. Ed. 2d 114, 121 (1985) (quoting *Monell*, 436 U.S. at 690 n.55, 56 L. Ed. 2d at 635 n.55). Thus, where the governmental entity may be held liable for damages resulting from its official policy, a suit naming public officers in their official capacity is redundant. *Id.* at 166, 87 L. Ed. 2d at 121 (official-capacity claim against public officer is claim against the office held by that person, rather than against the particular individual who occupies that office at the time the claim arose). Consequently, the claims against defendants Seagroves and High in their official capacities are merely another way of bringing suit against the City of Creedmoor. Accordingly, we reverse the Court of Appeals with respect to the City of Creedmoor as a municipality and as to defendants Seagroves and High in their official capacities.

## II.

[3] Plaintiffs next contend that the Court of Appeals erred in affirming summary judgment as to their constitutional claims against defendants Seagroves and High in their individual capacities. Specifically, plaintiffs' primary constitutional claim is that defendants violated their First Amendment right to free speech and to petition the government for redress of grievances. Plaintiffs argue that defendants decided to close Moore's Dinette in retaliation for Mr. Moore's criticism of the police department and city officials.

"Personal-capacity suits . . . seek to impose individual liability upon a government official for actions taken under color of state

law." Hafer, 502 U.S. at 25, 116 L. Ed. 2d at 309. Thus, "to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Graham*, 473 U.S. at 166, 87 L. Ed. 2d at 122. Where the First Amendment is implicated, any action which is taken in reckless disregard of a plaintiff's right will give rise to a section 1983 action. "While the plaintiff in a personal-capacity suit need not establish a connection to governmental 'policy or custom,' officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law." *Hafer*, 502 U.S. at 25, 116 L. Ed. 2d at 309-10 (quoting *Graham* 473 U.S. at 166, 87 L. Ed. 2d at 122).

In the opinion below, the Court of Appeals erroneously applied a balancing test derived from public employer-employee cases that was enunciated in *Lenzer v. Flaherty*, 106 N.C. App. 496, 418 S.E.2d 276, *disc. rev. denied*, 332 N.C. 345, 421 S.E.2d 348 (1992). Applying this balancing test, the Court of Appeals determined that plaintiffs' First Amendment rights to criticize city officials could be overridden by the city's statutory duty to keep the streets free for travel and to abate nuisances. This balancing test is not applicable to the case at bar. In *Lenzer*, a physician's assistant at the state Alcohol Rehabilitation Center sued the officials who employed her, contending that she had been discharged in violation of her free speech right to report patient abuse. The *Lenzer* court properly found that a public employer may have certain institutional interests that must be weighed against an employee's right to speak out on a matter of public concern. *See, e.g., Connick v. Myers*, 461 U.S. 138, 75 L. Ed. 2d 708 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 20 L. Ed. 2d 811 (1968) (discussing the balancing of competing employee and employer interests).

In the present case, plaintiffs are private citizens, not public employees, and there should be no balancing of competing interests with respect to their reports concerning the alleged negligence of city officials or the police department. To the contrary, they have a right to assert a public complaint concerning the negligence of public officials and to petition the government for redress of grievances. *Mills v. Alabama*, 384 U.S. 214, 16 L. Ed. 2d 484 (1966). The United States Supreme Court has repeatedly held that the First Amendment guarantees the right to criticize police officers. See *Norwell v. City of Cincinnati*, 414 U.S. 14, 38 L. Ed. 2d 170 (1973) (protecting the right to non-provocative voicing of objections to police action); *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L. Ed. 2d 686 (1964) (pro-

**MOORE v. CITY OF CREEDMOOR**

[345 N.C. 356 (1997)]

tecting the right to criticize police chief in context of libel lawsuit). It should also be noted that once the government has opened a forum—such as a public meeting—to allow direct citizen involvement, it may not discriminate between speakers based upon the content of their speech. *Madison Joint Sch. Dist. v. Wisconsin Employment Relations Comm'n*, 429 U.S. 167, 176, 50 L. Ed. 2d 376, 385 (1976).

Here, Mr. Moore filed written complaints against the police department, appeared at disciplinary hearings against officers, and made speeches at Board meetings criticizing the police department and the unfairness of the City's parking ordinance. In each of these situations, Mr. Moore was petitioning the government for a redress of grievances. When he spoke at disciplinary hearings and Board meetings, he was using a public forum. The majority of Mr. Moore's complaints concerning the police department and city officials centered around the operation of his business.

The evidence presented with respect to defendant Seagroves tended to show that Seagroves himself recruited and trained an undercover officer to gather evidence of illegal activity taking place at Moore's Dinette. Further, defendant High testified that Seagroves was annoyed at having to answer calls at the dinette and ordered his officers to make written reports any time they responded to calls at the dinette. Seagroves himself collected these reports and presented them to the Board and to the district attorney in order to persuade them to bring a nuisance abatement action against plaintiffs. Seagroves testified concerning the two "major incidents" which "finalized" his decision to seek the nuisance resolution. Admittedly, neither incident directly involved Moore's Dinette.

Additionally, evidence was presented which tended to show High aided Seagroves in carrying out his actions. Testimony showed that High and Seagroves collaborated on the passage of the parking ordinance, with Seagroves recommending that the City outlaw all parking on Lyon Street and High making the motion. High was still the Police Commissioner in 1989 when he purchased property surrounding the dinette. Two weeks after High initially invested in the property surrounding the dinette, he laid claim to the vacant lots adjacent to the dinette. These areas had previously been used by patrons of the dinette for parking. Subsequent to High's purchase of this land, the police department towed vehicles from this area. Further, although High was a private citizen when the nuisance abatement

action was commenced, he may still be held liable because private parties who conspire with public officials are subject to suit under section 1983. *See Dennis v. Sparks*, 449 U.S. 24, 66 L. Ed. 2d 185, *cert. denied*, 449 U.S. 1021, 66 L. Ed. 2d 483 (1980).

As we have previously stated, summary judgment is appropriate only if "there is no genuine issue as to any material fact." N.C.G.S. § 1A-1, Rule 56(c). Based on the evidence presented, the issue of whether defendants retaliated against plaintiffs by shutting down their business because Mr. Moore had exercised his freedom of speech is a factual issue which should be determined by a jury.

[4] Further, we hold that neither defendant is entitled to "qualified immunity." As we stated above, qualified immunity may protect government officials from personal liability for performing the discretionary functions of an office to the extent that such conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Corum, 330 N.C. at 772, 413 S.E.2d at 283 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 73 L. Ed. 2d 396, 410 (1982)). Applying this test requires a factual determination with respect to a defendant's motive, conduct, and the circumstances in which it occurred. When a defendant's subjective intent is an element of the plaintiff's claim and that defendant has moved for summary judgment, the plaintiff may avoid summary judgment by pointing to specific evidence that the defendant's actions were improperly motivated. *Id.* at 774, 413 S.E.2d at 283. After reviewing the events described above, along with a review of the transcript, we find plaintiffs have made this showing. Accordingly, we reverse the Court of Appeals and hold that summary judgment was improperly granted with respect to this issue.

### III.

[5] Finally, plaintiffs contend that the Court of Appeals erred in affirming the trial court's dismissal of the state law claim for punitive damages against defendant Seagroves individually in plaintiffs' malicious prosecution claim. Plaintiffs argue that they presented sufficient evidence to create an issue of fact as to Seagroves' motivation for initiating the public nuisance action. In the opinion below, the Court of Appeals stated that plaintiffs failed to produce sufficient evidence to show actual malice by Seagroves. We disagree.

We note that plaintiffs do not seek punitive damages against the City or against defendants High and Seagroves in their official capac-

**MOORE v. CITY OF CREEDMOOR**

[345 N.C. 356 (1997)]

ities. Plaintiffs recognize that the United States Supreme Court has ruled that punitive damages under section 1983 are not available against a municipal government. *City of Newport v. Facts Concerts, Inc.*, 453 U.S. 247, 69 L. Ed. 2d 616 (1981).

In the opinion below, the Court of Appeals properly noted that plaintiffs produced "both direct and circumstantial evidence" tending to show a "lack of probable cause for the institution of the public nuisance proceedings." *Moore v. City of Creedmoor*, 120 N.C. App. 27, 42, 460 S.E.2d 899, 908 (1995). Accordingly, the Court of Appeals found that plaintiffs satisfied their burden of showing that defendants acted with "legal malice," also known as implied or constructive malice. *Id.* at 44, 460 S.E.2d at 909. "Implied malice may be inferred from want of probable cause in reckless disregard of plaintiff[s'] rights." *Pitts v. Village Inn Pizza, Inc.*, 296 N.C. 81, 86-87, 249 S.E.2d 375, 379 (1978). The Court of Appeals then concluded that plaintiffs had failed to show actual malice.

" '[A] plaintiff may recover punitive damages only where the wrong is done willfully or under circumstances of rudeness, oppression, or in a manner which evidences a reckless and wanton disregard of the plaintiff's rights.' " *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 191, 437 S.E.2d 374, 379 (1993) (quoting *Hardy v. Toler*, 288 N.C. 303, 306-07, 218 S.E.2d 342, 345 (1975)). Plaintiffs may prove actual malice by showing that Seagroves was motivated by personal spite and a desire for revenge or that his actions towards plaintiffs were conducted "in a manner which showed reckless and wanton disregard of the plaintiff[s'] right[s]." *Jones v. Gwynne*, 312 N.C. 393, 405, 323 S.E.2d 9, 16 (1984).

In the present case, the evidence tended to show that Seagroves targeted Moore's Dinette as a trouble spot and felt Mr. Moore's persistent criticisms of the police department were unfounded. Testimony also revealed that Seagroves led the effort to pass a parking ordinance targeted at Moore's Dinette. Further testimony showed that Seagroves hired and supervised an undercover agent to obtain evidence of illegal activity by plaintiffs. Finally, as discussed above, Seagroves requested that the Board pass a resolution declaring the dinette a public nuisance and provided the district attorney with the incident report compiled by Seagroves.

A review of the record, along with the incidents discussed above, reveals that the evidence, when viewed in the light most favorable to plaintiffs, presents a genuine issue of material fact as to whether

actual malice existed on the part of Seagroves. Accordingly, we reverse the Court of Appeals' ruling on this issue.

### IV.

[6] With regard to the issue presented by virtue of the dissent, defendants argue that the Court of Appeals erred in concluding that defendants could be found to have "initiated" the malicious prosecution suit. Judge Greene, in his dissent, stated that plaintiffs' malicious prosecution claim was properly dismissed because, in his view, neither the City of Creedmoor nor defendant Seagroves "initiated" the public nuisance action against plaintiffs.

Justice Whichard recused and took no part in the consideration or decision of this case. The remaining members of the Court are equally divided on this issue, with three members voting to affirm and three members voting to reverse the decision of the Court of Appeals. Therefore, as to this issue, the decision of the Court of Appeals is left undisturbed and stands without precedential value. *See Nesbit v. Howard*, 333 N.C. 782, 429 S.E.2d 730 (1993).

As to the issues presented on discretionary review, this case is remanded to the Court of Appeals for further remand to the Superior Court, Granville County, for further proceedings not inconsistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Justice WHICHARD did not participate in the consideration or decision of this case.