IN THE SUPREME COURT OF NORTH CAROLINA

No. 130PA17

Filed 26 October 2018

JOAN A. MEINCK

v.

CITY OF GASTONIA, a North Carolina Municipal Corporation

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 798 S.E.2d 417 (2017), reversing and remanding an order granting summary judgment entered on 1 June 2016 by Judge Lisa Bell in Superior Court, Gaston County. On 8 June 2017, the Supreme Court allowed plaintiff's petition for discretionary review of additional issues. Heard in the Supreme Court on 6 February 2018.

*Law Office of Thomas D. Bumgardner, PLLC, by Thomas D. Bumgardner, for plaintiff-appellee/appellant.*

*Stott, Hollowell, Palmer & Windham, L.L.P., by Martha Raymond Thompson and Aaron C. Low, for defendant-appellant/appellee.*

*Martin & Jones, PLLC, by Huntington M. Willis; and Terpening Wilder Law, by William R. Terpening, for North Carolina Advocates for Justice, amicus curiae.*

*Clawson and Staubes, PLLC, by Andrew J. Santaniello; and Kimberly S. Hibbard, NCLM General Counsel, and Gregory F. Schwitzgebel III, NCLM Associate General Counsel, for North Carolina Association of Defense Attorneys and North Carolina League of Municipalities, amici curiae.*

HUDSON, Justice.

Here we consider whether the trial court erred in granting a motion for summary judgment in favor of defendant, the City of Gastonia, based upon the doctrine of governmental immunity. The Court of Appeals concluded that governmental immunity did not apply and reversed the trial court's order granting summary judgment in favor of defendant. *Meinck v. City of Gastonia*, ___ N.C. App. ___, 798 S.E.2d 417 (2017). Because we conclude that defendant is entitled to governmental immunity, we reverse the decision of the Court of Appeals and remand this case to that court for further proceedings.

Background

In 2011 defendant purchased from Gaston County a historic building located at 212 West Main Avenue in downtown Gastonia. According to an affidavit and deposition testimony from defendant's city manager, Edward C. Munn, defendant had determined that this vacant building was in a "strategic location" for defendant's effort to redevelop and revitalize the downtown area, which was rife with vacant and deteriorating properties. According to Munn, "your downtown is your face. It is how you project your image to the rest of anyone who wants to do commerce or if you want to live there." Defendant's intent in purchasing the building was to preserve it "but also to put it into use" and "not [ ] allow it to be vacant and deteriorate." Defendant had further determined that, based on other successful examples throughout the country, one of the "key pieces" necessary for revitalization was "bringing artists into

the downtown" and into the older buildings with the idea that the downtown area would thus become more attractive for businesses and people.

To that end, defendant began leasing the property to "nonprofit arts groups," first to the Gaston County Arts Council, Inc. from 2011 to 2013, and then, beginning in mid-2013, to the Gaston County Art Guild (the Art Guild). As with the nearly identical first lease agreement, the lease agreement between defendant and the Art Guild (the lease) provided that the Art Guild was to sublease portions of the building to individual artists (the subtenants) to use as studios—a cooperative enterprise[1] referred to as "Arts on Main." Under the lease defendant was responsible for maintaining the exterior of the premises and also had the right to inspect the property at any time.[2] The lease required the Art Guild to use the property "only for purposes of an art gallery and artists' studios and a gift shop" and required the subtenants to use the property only for creating and selling works of art. The lease fixed the rents to be paid by subtenants for the studio spaces at a range of $90.00 to $375.00 per month and provided that all art sales made at the property were subject to a 30% commission.

Under the lease defendant received 90% of all rents paid by the subtenants and 15% of "the gross receipts from all sales or commissions occurring on" the

---

[1] While one attachment to the lease described Arts on Main as "a cooperative business," Munn testified that it was more accurately characterized as "a non-profit cooperative effort to promote the arts."

[2] The subtenants' studio spaces were subject to inspection during normal business hours.

property.[3]  In addition, the lease required the subtenants to provide as consideration a minimum of fifteen hours per month of volunteer time tending the gallery and gift shop, and subtenants were expected to provide additional volunteer time necessary for the operation of Arts on Main as a "viable operation."  In the 2013 fiscal year, defendant's revenues received from the rents and sales or commissions amounted to $21,572.98.  Defendant's expenditures for that year totaled $33,062.01, which netted a loss of $11,489.03 for 2013.  In the 2014 fiscal year, defendant's revenues from the rents and sales or commissions totaled $21,935.57 and its expenditures totaled $40,008.13, netting defendant a loss of $18,072.56.  Additionally, Munn testified that defendant spent money on labor and overhead but did not include those items in its financial spreadsheet.  According to Munn, the city did not seek to make a profit from the lease with the Art Guild and "there's no profit in this operation."

On 11 December 2013, plaintiff, who was one of the subtenants of the Art Guild, was leaving the building through a rear exit carrying a stack of large pictures when she lost her balance on a set of steps and fell.  Evidence tended to show that part of the concrete steps had eroded.  Plaintiff suffered a broken hip and other injuries as a result of her fall, and she "required emergency medical treatment,

---

[3] The Court of Appeals erroneously stated that the lease "guaranteed Defendant 30% of the gross sales receipts received for art the Art Guild sold on the premises."  *Meinck*, ___ N.C. App. at ___, 798 S.E.2d at 420.  The lease subjected art sold by subtenants on the property to a minimum 30% commission, but under the lease defendant only received "an amount equal to 15% of the gross receipts from all sales or commissions occurring on the Premises."  Presumably, the Art Guild was entitled to the other portion of commissions.

surgery, hospitalization, and substantial rehabilitation." On 4 February 2015, plaintiff filed a complaint against defendant alleging that defendant was negligent in failing to maintain the building's exit in a reasonably safe condition and failing to warn of the dangerous and hazardous condition of the exit. Plaintiff's complaint alleged that defendant had waived any claim of governmental immunity by purchasing liability insurance and also that defendant's tortious conduct occurred while defendant was engaged in a proprietary function, thereby depriving defendant of governmental immunity.

On 12 January 2016, defendant filed a motion for summary judgment asserting that the city was entitled to governmental immunity, that defendant was not negligent as a matter of law, and that plaintiff was contributorily negligent as a matter of law. The trial court determined that defendant's liability insurance policy "contained an express non-waiver provision" and therefore, defendant had not waived any claim of governmental immunity. The trial court further concluded that "the City leased the property to the Art Guild as part of its governmental function to revitalize the downtown area, preserve a historical structure, and prevent deterioration of the downtown area" and accordingly, was "entitled to governmental immunity regarding Plaintiff's claims." On that basis, the trial court granted summary judgment for defendant. Additionally, the trial court determined that, although the issue was moot in light of the court's ruling on immunity, the court would deny defendant's motion

for summary judgment based on plaintiff's contributory negligence. Plaintiff appealed this order to the Court of Appeals.

At the Court of Appeals plaintiff argued that defendant's ownership and maintenance of the building leased to the Art Guild as part of defendant's downtown revitalization efforts was a proprietary function and not a governmental function; therefore, defendant was not entitled to governmental immunity. The Court of Appeals agreed, noting first that governmental immunity applies only if a municipality is engaging in a governmental function, as opposed to a proprietary function. *Meinck*, ___ N.C. App. at ___, 798 S.E.2d at 421. The court stated that the "threshold inquiry" in making the distinction between governmental and proprietary functions is "whether, and to what degree, the legislature has addressed the issue." *Id.* at ___, 798 S.E.2d at 421 (quoting *Estate of Williams v. Pasquotank Cty. Parks & Recreation Dep't*, 366 N.C. 195, 200, 732 S.E.2d 137, 141-42 (2012)). The court determined that the legislature did not specify in N.C.G.S. § 160A-272, which authorizes cities to lease property to private parties, whether such activity is governmental or proprietary. *Id.* at ___, 798 S.E.2d at 421. Here the Court of Appeals also recognized that N.C.G.S. § 160A-535 authorizes cities to establish municipal service districts for the purpose of downtown revitalization projects like the one engaged in by defendant here but determined that "[n]owhere has the legislature deemed all downtown revitalization projects undertaken by a city within a service district to be activities[ ] which are exempt from suit through governmental

immunity." *Id.* at ___, 798 S.E.2d at 421. Addressing the next inquiry, which is whether an activity "can only be provided by a governmental agency or instrumentality," *id.* at ___, 798 S.E.2d at 421 (quoting *Williams*, 366 N.C. at 202, 732 S.E.2d at 142), the court determined that "[t]he ownership and maintenance of property leased to a private entity is not an activity[ ] which is provided only by a governmental agency or instrumentality," *id.* at ___, 798 S.E.2d at 421-22.

The Court of Appeals then addressed additional factors, including "whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider." *Id.* at ___, 798 S.E.2d at 422 (quoting *Williams*, 366 N.C. at 202-03, 732 S.E.2d at 143 (footnotes omitted)). The court determined that defendant's activity here is not one "solely and traditionally provided by a governmental entity." *Id.* at ___, 798 S.E.2d at 422. Further, in reliance on *Glenn v. City of Raleigh*, 246 N.C. 469, 98 S.E.2d 913 (1957), the court determined that, although defendant's revenues from the rents and sales or commissions did not cover its operating costs and were far exceeded by its expenditures, the revenues were "substantial" and provided "such a pecuniary advantage to exclude the application of government immunity as a matter of law," *id.* at ___, 798 S.E.2d at 422 (citing *Glenn*, 246 N.C. at 476-77, 98 S.E.2d at 918-19). The court held that "[i]n light of all these factors," defendant was not entitled to governmental immunity, *id.* at ___, 798 S.E.2d at 422, and it thus reversed the trial

court's entry of summary judgment in favor of defendant on that basis, *id.* at ___, 798 S.E.2d at 424. Having reached this conclusion, the court did not address plaintiff's argument that defendant's non-waiver provision in its liability insurance contract did not effectively preserve defendant's governmental immunity.

Additionally, the court addressed the parties' arguments on negligence and contributory negligence. *Id.* at ___, 798 S.E.2d at 422-24. The court determined that "Plaintiff's forecast of evidence is sufficient to raise the genuine issues of material fact of whether Defendant negligently failed to maintain the steps on which Plaintiff tripped or acted negligently in failing to warn about the condition of the steps." *Id.* at ___, 798 S.E.2d at 423. Moreover, the court determined that "a jury could find Plaintiff . . . acted reasonably in using the exit with the hazardous steps" because "[n]o evidence of other means of exiting the building was presented" and "[t]he carrying of large pictures out of the art gallery is a reasonable, non-negligent use of the exit." *Id.* at ___, 798 S.E.2d at 424. Accordingly, the court concluded that defendant was not entitled to summary judgment on the issue of plaintiff's contributory negligence. *Id.* at ___, 798 S.E.2d at 424.

On 20 April 2017, defendant filed a petition for discretionary review seeking review of the decision of the Court of Appeals that concluded that governmental immunity did not apply and that plaintiff was not contributorily negligent as a matter of law. Plaintiff filed a conditional petition for discretionary review on 28 April 2017

also seeking review of the issue of plaintiff's contributory negligence. This Court allowed both petitions on 8 June 2017.

Analysis

Defendant argues that the Court of Appeals erred in reversing the trial court's order granting summary judgment for defendant on the basis of governmental immunity. We agree.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c) (2017). We review a trial court's order denying a motion for summary judgment de novo. *E.g.*, *Bynum v. Wilson County.*, 367 N.C. 355, 358, 758 S.E.2d 643, 645 (2014) (citing *Williams*, 366 N.C. at 198, 732 S.E.2d at 140). We review decisions of the Court of Appeals for errors of law. *E.g.*, *Irving v. Charlotte-Mecklenburg Bd. of Educ.*, 368 N.C. 609, 611, 781 S.E.2d 282, 284 (2016) (citing N.C. R. App. P. 16(a)).

"Under the doctrine of governmental immunity, a county or municipal corporation 'is immune from suit for the negligence of its employees in the exercise of *governmental functions* absent waiver of immunity.' " *Williams*, 366 N.C. at 198, 732 S.E.2d at 140 (emphasis added) (quoting *Evans ex rel. Horton v. Hous. Auth. Of Raleigh*, 359 N.C. 50, 53, 602 S.E.2d 668, 670 (2004)). When, however, a county or municipality is engaged in a "*proprietary function*," governmental immunity does not

apply. *Id.* at 199, 732 S.E.2d at 141 (emphasis added) (citing *Town of Grimesland v. City of Washington*, 234 N.C. 117, 123, 66 S.E.2d 794, 798 (1951)). As a result, the determination of "whether an entity is entitled to governmental immunity . . . turns on whether the alleged tortious conduct of the county or municipality arose from an activity that was governmental or proprietary in nature." *Id.* at 199, 732 S.E.2d at 141.

In *Williams* we addressed this distinction between governmental and proprietary functions, noting that:

> We have long held that a "governmental" function is an activity that is "discretionary, political, legislative, or public in nature and performed for the public good in behalf of the State rather than for itself." *Britt v. City of Wilmington*, 236 N.C. 446, 450, 73 S.E.2d 289, 293 (1952). A "proprietary" function, on the other hand, is one that is "commercial or chiefly for the private advantage of the compact community." *Id.*[ at 450, 73 S.E.2d at 293]; *see also Evans*, 359 N.C. at 54, 602 S.E.2d at 671 (describing the test set forth in *Britt* as our "one guiding principle").

> Our reasoning when distinguishing between governmental and proprietary functions has been relatively simple, though we have acknowledged the difficulties of making the distinction. *Evans*, 359 N.C. at 54, 602 S.E.2d at 671 ("The difficulties of applying this principle have been noted." (citations omitted)). "When a municipality is acting 'in behalf of the State' in promoting or protecting the health, safety, security, or general welfare of its citizens, it is an agency of the sovereign. When it engages in a public enterprise essentially for the benefit of the compact community, it is acting within its proprietary powers." *Britt*, 236 N.C. at 450-51, 73 S.E.2d at 293.

*Id.* at 199-200, 732 S.E.2d at 141 (citation omitted). Furthermore, to aid in making this distinction, we recognized that "[o]ur case law demonstrates that a number of factors are relevant when ascertaining whether action undertaken by a county or municipality is governmental or proprietary in nature." *Id.* at 200, 732 S.E.2d at 141.

First, we concluded that "the threshold inquiry . . . is whether, and to what degree, the legislature has addressed the issue." *Id.* at 200, 732 S.E.2d at 141-42; *see id.* at 200-01, 732 S.E.2d at 142 ("This is especially so given . . . that any change in the common law doctrine of governmental immunity is a matter for the legislature." (citation omitted)). Recognizing that even the legislature's designation of a general activity as a governmental function may not be dispositive on the specific facts of a case, we stated that "[w]hen the legislature has not directly resolved whether a specific activity is governmental or proprietary in nature, other factors are relevant." *Id.* at 202, 732 S.E.2d at 142. The first of these additional factors is whether "the undertaking is one in which ***only*** a governmental agency could engage," in which case "it is perforce governmental in nature." *Id.* at 202, 732 S.E.2d at 142 (citations omitted). Acknowledging that in more recent years this determination had become "increasingly difficult" because "many services once thought to be the sole purview of the public sector have been privatized in full or in part," we continued, stating that

> when the particular service can be performed both
> privately and publicly, the inquiry involves consideration
> of a number of additional factors, of which no single factor
> is dispositive. Relevant to this inquiry is whether the
> service is traditionally a service provided by a

governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider. We conclude that consideration of these factors provides the guidance needed to identify the distinction between a governmental and proprietary activity. Nevertheless, we note that the distinctions between proprietary and governmental functions are fluid and courts must be advert to changes in practice. We therefore caution against overreliance on these four factors.

*Id.* at 202-03, 732 S.E.2d at 143 (footnotes omitted). Finally, we emphasized that "the proper designation of a particular action of a county or municipality is a fact intensive inquiry" and "may differ from case to case." *Id.* at 203, 732 S.E.2d at 143.

Here it is undisputed that the activity out of which defendant's alleged tortious conduct arose was defendant's leasing of the property at 212 West Main Avenue to the Art Guild. It is further undisputed that defendant purchased this historic and vacant property and entered into the lease as part of its efforts at urban redevelopment and downtown revitalization. With regard to the "threshold inquiry" under *Williams*, *id.* at 200, 732 S.E.2d at 141-42, several statutes are relevant to the activity in which defendant was engaged.

First, N.C.G.S. § 160A-272 authorizes a city to lease or rent any property it owns "but not for longer than 10 years . . . and only if the council determines that the property will not be needed by the city for the term of the lease." N.C.G.S. § 160A-272(a) (2017). This statute requires the lease or rental agreement to be authorized by a resolution "adopted at a regular council meeting upon 30 days' public notice."

*Id.* § 160A-272(a1) (2017).[4] Nothing in this statute indicates any intent by the legislature to designate the leasing of property authorized therein as a governmental or proprietary function. As a result, we conclude that the legislature has not addressed whether the leasing by a city of its unused property is generally a governmental or proprietary function. Additional statutes, however, are more specific to the activity engaged in by defendant here.

In Article 22 of Chapter 160A (the Urban Redevelopment Law), the legislature addressed the problem of "blighted areas" and authorized municipalities to engage in "redevelopment projects" in the interest of public health, safety, convenience, and welfare. N.C.G.S. §§ 160A-500 to -526 (2017). In N.C.G.S. § 160A-501 the legislature made the following findings:

> (1) That there exist in urban communities in this State blighted areas as defined herein.
>
> (2) That such areas are economic or social liabilities, inimical and injurious to the public health, safety, morals and welfare of the residents of the State, harmful to the social and economic well-being of the entire communities in which they exist, depreciating values therein, reducing tax revenues, and thereby depreciating further the general community-wide values.
>
> (3) That the existence of such areas contributes substantially and increasingly to the spread of disease

---

[4] "No public notice . . . need be given for resolutions authorizing leases or rentals for terms of one year or less, and the council may delegate to the city manager or some other city administrative officer authority to lease or rent city property for terms of one year or less." N.C.G.S. § 160A-272(b) (2017).

and crime, necessitating excessive and disproportionate expenditures of public funds for the preservation of the public health and safety, for crime prevention, correction, prosecution, punishment and the treatment of juvenile delinquency and for the maintenance of adequate police, fire and accident protection and other public services and facilities, constitutes an economic and social liability, substantially impairs or arrests the sound growth of communities.

(4) That the foregoing conditions are beyond remedy or control entirely by regulatory processes in the exercise of the police power and cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted.

(5) That the acquisition, preparation, sale, sound replanning, and redevelopment of such areas in accordance with sound and approved plans for their redevelopment will promote the public health, safety, convenience and welfare.

*Id.* Accordingly, the legislature

hereby declared [it] to be the policy of the State of North Carolina to promote the health, safety, and welfare of the inhabitants thereof by the creation of bodies corporate and politic to be known as redevelopment commissions, which shall exist and operate for the public purposes of acquiring and replanning such areas and of holding or disposing of them in such manner that they shall become available for economically and socially sound redevelopment. Such purposes are hereby declared to be public uses for which public money may be spent, and private property may be acquired by the exercise of the power of eminent domain.

*Id.* The legislature made additional findings in N.C.G.S. § 160A-502, providing:

(1) That the cities of North Carolina constitute important assets for the State and its citizens; that the

preservation of the cities and of urban life against physical, social, and other hazards is vital to the safety, health, and welfare of the citizens of the State, and sound urban development in the future is essential to the continued economic development of North Carolina, and that the creation, existence, and growth of substandard areas present substantial hazards to the cities of the State, to urban life, and to sound future urban development.

(2) That blight exists in commercial and industrial areas as well as in residential areas, in the form of dilapidated, deteriorated, poorly ventilated, obsolete, overcrowded, unsanitary, or unsafe buildings, inadequate and unsafe streets, inadequate lots, and other conditions detrimental to the sound growth of the community; that the presence of such conditions tends to depress the value of neighboring properties, to impair the tax base of the community, and to inhibit private efforts to rehabilitate or improve other structures in the area; and that the acquisition, preparation, sale, sound replanning and redevelopment of such areas in accordance with sound and approved plans will promote the public health, safety, convenience and welfare.

(3) That not only is it in the interest of the public health, safety, convenience and welfare to eliminate existing substandard areas of all types, but it is also in the public interest and less costly to the community to prevent the creation of new blighted areas or the expansion of existing blighted areas; that vigorous enforcement of municipal and State building standards, sound planning of new community facilities, public acquisition of dilapidated, obsolescent buildings, and other municipal action can aid in preventing the creation of new blighted areas or the expansion of existing blighted areas; and that rehabilitation, conservation, and reconditioning of areas in accordance with sound and approved plans, where, in the absence of such action, there is a clear

and present danger that the area will become blighted,
will protect and promote the public health, safety,
convenience and welfare.

*Id.*[5] In accordance with these findings and policies, the legislature authorized the governing bodies of municipalities to create a separate body to act as a "redevelopment commission," N.C.G.S. § 160A-504(a), or to simply "undertake to exercise such powers, duties, and responsibilities [of a redevelopment commission] itself," *id.* § 160A-505(a).[6] These "public and essential governmental powers . . . include all powers necessary or appropriate to carry out and effectuate the purposes and provisions of this Article." *Id.* § 160A-512. The legislature also enumerated a nonexhaustive list of grants of authority under this Article:

> (3) To act as agent of the State or federal government or any of its instrumentalities or agencies for the public purposes set out in this Article;
>
> (4) To prepare or cause to be prepared and recommend redevelopment plans to the governing body of the

---

[5] Again, the legislature made a declaration of policy, providing that

> it is hereby declared to be the policy of the State of North Carolina to protect and promote the health, safety, and welfare of the inhabitants of its urban areas by authorizing redevelopment commissions to undertake nonresidential redevelopment in accord with sound and approved plans and to undertake the rehabilitation, conservation, and reconditioning of areas where, in the absence of such action, there is a clear and present danger that the area will become blighted.

N.C.G.S. § 160A-502.

[6] A municipality may also "designate a housing authority created under the provisions of Chapter 157 [Housing Authorities and Projects] to exercise the powers, duties, and responsibilities of a redevelopment commission." N.C.G.S. § 160A-505(a).

municipality and to undertake and carry out "redevelopment projects" within its area of operation;

. . . .

(6) Within its area of operation, to purchase, obtain options upon, acquire by gift, grant, devise, eminent domain or otherwise, any real or personal property or any interest therein, together with any improvements thereon, necessary or incidental to a redevelopment project, except that eminent domain may only be used to take a blighted parcel; to hold, improve, clear or prepare for redevelopment any such property, and subject to the provisions of G.S. 160A-514, and with the approval of the local governing body sell, exchange, transfer, assign, subdivide, retain for its own use, mortgage, pledge, hypothecate or otherwise encumber or dispose of any real or personal property or any interest therein, either as an entirety to a single "redeveloper" or in parts to several redevelopers; provided that the commission finds that the sale or other transfer of any such part will not be prejudicial to the sale of other parts of the redevelopment area, nor in any other way prejudicial to the realization of the redevelopment plan approved by the governing body; to enter into contracts, either before or after the real property that is the subject of the contract is acquired by the Commission (although disposition of the property is still subject to G.S. 160A-514), with "redevelopers" of property containing covenants, restrictions, and conditions regarding the use of such property for residential, commercial, industrial, recreational purposes or for public purposes in accordance with the redevelopment plan and such other covenants, restrictions and conditions as the commission may deem necessary to prevent a recurrence of blighted areas or to effectuate the purposes of this Article; to make any of the covenants, restrictions or conditions of the foregoing contracts covenants running with the land, and to provide appropriate remedies for any breach of any such

covenants or conditions, including the right to terminate such contracts and any interest in the property created pursuant thereto; to borrow money and issue bonds therefor and provide security for bonds; to insure or provide for the insurance of any real or personal property or operations of the commission against any risks or hazards, including the power to pay premiums on any such insurance; and to enter into any contracts necessary to effectuate the purposes of this Article;

. . . .

(11) To make such expenditures as may be necessary to carry out the purposes of this Article; and to make expenditures from funds obtained from the federal government[.]

*Id.* Plaintiff does not dispute that defendant's purchase of the vacant property at 212 West Main Avenue and its lease of the property to the Art Guild in order to promote the arts for the purpose of revitalizing the downtown area is a valid redevelopment activity under the Urban Redevelopment Law.

Also relevant to the activity at issue here is Article 23, the "Municipal Service District Act of 1973" (the Municipal Service District Act), N.C.G.S. §§ 160A-535 to -544 (2017), which allows cities to establish "service districts in order to finance, provide, or maintain for the districts one or more of the following services, facilities, or functions in addition to or to a greater extent than those financed, provided or maintained for the entire city," *id.* § 160A-536(a). These services include "[d]owntown revitalization projects," *id.* § 160A-536(a)(2), which overlap with the activities authorized by the Urban Redevelopment Law, and are defined as

-18-

improvements, services, functions, promotions, and developmental activities intended to further the public health, safety, welfare, convenience, and economic well-being of the central city or downtown area. Exercise of the authority granted by this Article to undertake downtown revitalization projects financed by a service district do not prejudice a city's authority to undertake urban renewal projects in the same area. Examples of downtown revitalization projects include by way of illustration but not limitation all of the following:

. . . .

(7) Sponsoring festivals and markets in the downtown area, promoting business investment in the downtown area, helping to coordinate public and private actions in the downtown area, and developing and issuing publications on the downtown area.

*Id.* § 160A-536(b). Plaintiff argues in her brief that defendant's activity here is not a valid downtown revitalization project because it does not meet any of the "categories of conduct" defined by the legislature in subsection 160A-536(b). We disagree, and we conclude there is no genuine issue of material fact with respect to this issue. Plaintiff neglects to mention that the "categories" enumerated in the statute are mere examples and are explicitly nonexhaustive. *See id.* § 160A-536(b) (providing that "[e]xamples of downtown revitalization projects include by way of illustration but not limitation all of the following"). We conclude that the uncontroverted evidence presented in the trial court establishes that defendant's activity is a valid "service[ ], function[ ], promotion[ ], [or] developmental activit[y] intended to further the public health, safety, welfare, convenience, and economic well-being of the central city or

downtown area." *Id.* We further conclude that defendant's activity falls under the example in subdivision (7) in that defendant's "Arts on Main" project is a cooperative public and private initiative wherein a market is established to sell and promote the arts in the downtown area.

In its analysis of the threshold inquiry, the Court of Appeals below briefly mentioned the Municipal Service District Act before concluding that "[n]owhere has the legislature deemed all downtown revitalization projects undertaken by a city within a service district to be activities[ ] which are exempt from suit through governmental immunity." *Meinck*, ___ N.C. App. at ___, 798 S.E.2d at 421. This portion of the court's analysis, which notably omitted any mention of the Urban Redevelopment Law, tends to suggest that a legislative provision that addresses a particular activity but does not explicitly provide that such activity is a governmental function immune from suit has no bearing on a determination of whether the activity is governmental or proprietary. The inquiry, however, is not merely whether the legislature has explicitly provided that a specific activity is governmental but rather, "*whether, and to what degree*, the legislature has addressed the issue." *Williams*, 366 N.C. at 200, 732 S.E.2d at 142 (emphasis added).

For example, in *Williams*, while we reserved comment on whether a statute at issue there was "ultimately determinative in light of the facts at hand" and left that determination to the trial court upon remand, we did note that the statute at issue was, at a minimum, "clearly relevant" to whether the defendants' activity was

governmental or proprietary. *Id.* at 201, 732 S.E.2d at 142 (emphases omitted). Furthermore, in arriving at our conclusion in *Williams* that the "threshold inquiry" was the extent to which the legislature had addressed the issue, we discussed as an example *Evans*, in which the Court "considered the Housing Authorities Law in holding that a housing authority was protected by governmental immunity against allegations of lead paint-based injuries." *Id.* at 200, 732 S.E.2d at 141 (internal citation omitted) (citing *Evans*, 359 N.C. at 55-56, 602 S.E.2d at 671-72). Notably, the plaintiff in *Evans* argued that the defendant was not immune "because the Housing Authorities Law does not *specifically provide* for immunity." *Evans*, 359 N.C. at 54, 602 S.E.2d at 671 (emphasis added). We rejected that argument, noting that

> in enacting the Housing Authorities Law at issue, the General Assembly provided
>
>> "that unsanitary or unsafe dwelling accommodations exist in urban and rural areas throughout the State . . .; that these conditions cannot be remedied by the ordinary operation of private enterprise; that the . . . providing of safe and sanitary dwelling accommodations for persons of low income are *public uses and purposes for which public money may be spent* and private property acquired; . . . and that the necessity for the provisions hereinafter enacted is hereby declared as a matter of legislative determination to be in the public interest."
>
> *Id.* at 55, 602 S.E.2d at 672 (alterations in original) (citing N.C.G.S. § 157-2(a) (2003)). We considered the emphasized

-21-

> language a significant "statutory indication that the provision of low and moderate income housing is a governmental function." *Id.*

*Williams*, 366 N.C. at 200, 732 S.E.2d at 141. Based on this "statutory indication," in conjunction with our prior case law interpreting the original Housing Authorities Law, as well as the principle "that an 'activity of the municipality which is . . . public in nature and performed for the public good in behalf of the State . . . comes within the class of governmental functions,' " *Evans*, 359 N.C. at 55-56, 602 S.E.2d at 671-72 (alterations in original) (quoting *Millar v. Town of Wilson*, 222 N.C. 340, 341, 23 S.E.2d 42, 44 (1942)), we determined that the defendant in *Evans* was entitled to governmental immunity on the facts of that case, *id.* at 56, 602 S.E.2d at 672. Thus, even when the legislature "has not directly resolved whether a specific activity is governmental or proprietary in nature," *Williams*, 366 N.C. at 202, 732 S.E.2d at 142, a legislative provision addressing the activity may still be relevant—in conjunction with the other *Williams* factors—to a determination of whether an activity is governmental, particularly if the statutory language suggests "a significant 'statutory indication' that the [activity] is a governmental function," *id.* at 200, 732 S.E.2d at 141 (quoting *Evans*, 359 N.C. at 55, 602 S.E.2d at 672).

In that regard, we note that certain language from the Urban Redevelopment Law is similar in significant respects to the emphasized language from the Housing Authorities Law in *Evans*. *Compare* N.C.G.S. § 160A-501 (providing that "the public purposes of acquiring and replanning [blighted] areas and of holding or disposing of

them in such manner that they shall become available for economically and socially sound redevelopment . . . . are hereby declared to be *public uses for which public money may be spent*" (emphasis added)), *with Evans*, 359 N.C. at 55, 602 S.E.2d at 672 ("[T]he . . . providing of safe and sanitary dwelling accommodations for persons of low income are *public uses and purposes for which public money may be spent* and private property acquired . . . ." (first ellipsis in original) (quoting N.C.G.S. § 157-2(a) (2003) (emphasis added))). Moreover, in both enactments the legislature recognized a serious problem that could not be adequately remedied by private enterprise alone. *Compare* N.C.G.S. § 160A-501(4) (providing that "the foregoing conditions are beyond remedy or control entirely by regulatory processes in the exercise of the police power and cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted"), *with Evans*, 359 N.C. at 55, 602 S.E.2d at 672 ("[T]hese conditions cannot be remedied by the ordinary operation of private enterprise . . . ." (quoting N.C.G.S. § 157-2(a))). Additionally, both the Urban Redevelopment Law and the Municipal Service District Act establish that downtown revitalization is—like the provision of low and moderate income housing under the Housing Authorities Law—in the public interest. *Compare* N.C.G.S. § 160A-502(3) (providing that "not only is it in the interest of the public health, safety, convenience and welfare to eliminate existing substandard areas of all types, but it is also in the public interest and less costly to the community to prevent the creation of new blighted areas or the expansion of existing blighted areas"), *and id.* § 160A-536(b)

(providing that " 'downtown revitalization projects' are improvements, services, functions, promotions, and developmental activities intended to further the public health, safety, welfare, convenience, and economic well-being of the central city or downtown area"), *with Evans*, 359 N.C. at 55, 602 S.E.2d at 672 ("[T]he necessity for the provisions hereinafter enacted is hereby declared as a matter of legislative determination to be in the public interest." (quoting N.C.G.S. § 157-2(a))).  We conclude that these provisions of the Urban Redevelopment Law and the Municipal Service District Act are statutory indications that an urban redevelopment project undertaken in accordance with these statutes and for the purpose of "promot[ing] the health, safety, and welfare of the inhabitants" of the State of North Carolina is a governmental function.  N.C.G.S. § 160A-501; *see Williams*, 366 N.C. at 200, 732 S.E.2d at 141 (explaining that a municipality is "an agency of the sovereign" and engaged in a governmental function when it "is acting 'in behalf of the State' in promoting or protecting the health, safety, security, or general welfare of its citizens" (quoting *Britt*, 236 N.C. at 450, 73 S.E.2d at 293)).

Nonetheless, as the Court of Appeals correctly recognized, the legislature has not deemed all urban redevelopment and downtown revitalization projects governmental functions that are immune from suit.  Moreover, in *Williams* we recognized that even when the legislature has designated a general activity to be "a governmental function by statute, the question remains whether the specific [activity at issue], in this case and under these circumstances, is a governmental function."

366 N.C. at 201, 732 S.E.2d at 142 (citation omitted).  Thus, while the applicable statutory provisions are "clearly relevant," we conclude that the legislature has not "directly resolved" whether defendant's lease of 212 West Main Avenue to the Art Guild as part of its downtown revitalization efforts "is governmental or proprietary in nature," thus requiring us to examine "other factors [that] are relevant."  *Id.* at 201-02, 732 S.E.2d at 142 (emphasis omitted).

The first of these additional factors inquires "if the undertaking is one in which only a governmental agency could engage," in which event "it is perforce governmental in nature."  *Id.* at 202, 732 S.E.2d at 142 (emphasis omitted).  Relevant to this consideration, although not dispositive, are the legislature's statements regarding the "economic or social liabilities" caused by "blighted areas," specifically "[t]hat the foregoing conditions are beyond remedy or control entirely by regulatory processes in the exercise of the police power and *cannot be effectively dealt with by private enterprise under existing law without the additional aids herein granted.*"  N.C.G.S. § 160A-501(1), (2), (4) (emphasis added).  Assuredly, this legislative finding does not preclude private entities from *engaging* in redevelopment projects and downtown revitalization activities, and a private entity could conceivably engage in the same activity as defendant did here.  Thus, we cannot conclude that this legislative pronouncement is dispositive; that is, it does not render defendant's leasing of the property to the Art Guild in order to promote the arts for the purpose of urban redevelopment and downtown revitalization an "undertaking . . . in which

***only*** a governmental agency could *engage.*" *Williams*, 366 N.C. at 202, 732 S.E.2d at 142 (second emphasis added). Nonetheless, we find the legislative determination that the *purposes* of urban redevelopment can be accomplished *only* when governmental agencies engage in such activities to be a relevant consideration under this factor, as well as another statutory indication that an activity undertaken for urban redevelopment and to promote the public interest is governmental in nature.

Because the particular activity here can be performed both publicly and privately, we consider "a number of additional factors," including "whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether that fee does more than simply cover the operating costs of the service provider." *Id.* at 202-03, 732 S.E.2d at 143 (footnotes omitted). Defendant argues that maintaining a historic and vacant building and leasing it to a nonprofit art guild is an undertaking that is not traditionally provided by an entity other than a governmental agency or instrumentality. Yet, defendant has not pointed to any evidence or authority, nor are we aware of any, that supports this assertion.

We have evidence, however, of the fees charged and the costs incurred by defendant. Here the lease sets rental rates for the Art Guild's subtenants in a range of not more than $90.00 to $375.00 per month, of which 90% is paid to defendant. Furthermore, defendant receives 15% of all sales or commissions under the lease, and subtenants are required to provide additional consideration in the form of volunteer

time, with a minimum of fifteen hours per month. For the 2013 fiscal year, defendant's revenues from the rent and sales or commissions amounted to $21.572.98. Defendant's expenditures for that year totaled $33,062.01, with the city's electric charges alone totaling $26,547.34. Thus, defendant netted a loss of $11,489.03 that year. Defendant's loss for the 2014 fiscal year was even greater, with defendant's revenues amounting to $21,935.57 and its expenditures totaling $40,008.13, netting defendant a loss of $18,072.56. In addition, Munn testified that defendant spent money on labor and overhead but did not include those items in its financial spreadsheet. Despite these losses, plaintiff asserts that defendant received "financial gain" and that defendant's financial spreadsheet reflects a "budget surplus," referring to the fact that defendant spent less than was budgeted for Arts on Main. But this "surplus" reflected in the spreadsheet would, if anything, seemingly support defendant's position because it demonstrates that defendant had budgeted for, and prepared to suffer, losses even greater than the considerable loss it actually incurred. As Munn testified, the city did not seek to make a profit from the lease with the Art Guild and "there's no profit in this operation." We conclude that the revenues received by defendant under the lease are not "substantial," particularly because such revenues were not designed even to "simply cover the operating costs of the service provider," nor did they do so in reality.[7] *Id.* at 202-03, 732 S.E.2d at 143.

---

[7] In reaching a different conclusion with respect to the revenues received by defendant, the Court of Appeals relied on *Glenn v. City of Raleigh*. In *Glenn*, which considerably

Recognizing that the additional factors listed in *Williams* are not exhaustive, *id.* at 203, 732 S.E.2d at 143 ("[T]he distinctions between proprietary and governmental are fluid . . . . We therefore caution against overreliance on these four factors."), we also consider as relevant the particular and decidedly noncommercial nature of defendant's undertaking here. Art occupies a unique role in our society and our state, as evidenced by the legislature's tasking the Department of Natural and Cultural Resources in Chapter 143, Article 47 (Promotion of Arts), with various duties connected with promoting the arts in this state, including "[a]ssist[ing] local organizations and the community at large with needs, resources and opportunities in the arts" and "[a]ssist[ing] in bringing the highest obtainable quality in the arts to

predates our decision in *Williams*, the plaintiff was injured by a rock launched from a lawn mower being operated at Pullen Park, which was maintained by the defendant. *Id.* at 470-71, 98 S.E.2d at 914. It appears that the majority in *Glenn*, in reviewing the trial court's denial of a motion for nonsuit on the basis of governmental immunity, did not consider the defendant's evidence of the costs incurred in maintaining the park. *Id.* at 477, 98 S.E.2d at 919 ("Considering plaintiff's evidence in the light most favorable to him, and disregarding defendant's evidence which tends to establish another and a different state of facts, or which tends to impeach or contradict his evidence, which we are required to do on the motion for judgment of nonsuit, it is our opinion that the net revenue of $18,531.14 for the fiscal year 1 July 1952 to 30 June 1953 received by the city of Raleigh from the operation of Pullen Park for that period, which was used by the city for the capital maintenance of the park area, building items, paying salaries, buying fuel, etc., (the evidence that the $18,531.14 was spent in the amusement area only is the defendant's evidence), was such as to remove it, for the purposes of the consideration of a motion for judgment of nonsuit, from the category of incidental income, and to import such a corporate benefit or pecuniary profit or pecuniary advantage to the city of Raleigh as to exclude the application of governmental immunity." (citations omitted)). Whether or not the majority's decision to limit its review in this manner was procedurally correct, that is not the situation here, in which the trial court properly considered both parties' evidence on the motion for summary judgment—including defendant's evidence both of its revenue received and its costs incurred—in order to determine if there was a genuine issue of material fact.

the State; promot[ing] the maximum opportunity for the people to experience, enjoy, and profit from those arts." N.C.G.S. § 143-406(2), (5) (2017).[8] Defendant's undertaking to promote the arts by bringing individual, local artists into the downtown area furthers these aims, which in turn dovetail with the overall goal of revitalizing the downtown area.

Plaintiff does not actually dispute that defendant's lease with the Art Guild for the purpose of promoting the arts was an earnest effort at redeveloping and revitalizing its downtown area or that defendant did not seek or obtain any profit from this activity. Rather, the thrust of plaintiff's argument is that case law dictates that the "lease of government property to third parties" is a proprietary function. This broad proposition is not supported by plaintiff's proffered authorities, none of which are binding on this Court. To the extent plaintiff relies upon this Court's decision in *Aaser v. City of Charlotte*, in which the Court held the activities at issue were proprietary, that case is easily distinguished. 265 N.C. 494, 144 S.E.2d 610 (1965). There we determined that "the holding of exhibitions and athletic events" at the defendant's hockey arena was "to produce revenue and [was] for the private advantage of the compact community," and therefore, the defendant was "engaging

---

[8] The legislature also created the North Carolina Arts Council to assist the Department in this function, providing that the Council is to, *inter alia*, "advise the Secretary [of Natural and Cultural Resources] concerning assistance to local organizations and the community at large in the area of the arts" and "advise the Secretary in regard to bringing the highest obtainable quality in the arts to the State and promoting the maximum opportunity for the people to experience and enjoy those arts." N.C.G.S. § 143B-87(2), (5) (2017).

in a proprietary function when it operates such an arena, or leases it to the promoter of an athletic event, and when it operates refreshment stands in the corridors of the building for the sale of drinks and other items to the patrons of such an event." *Id.* at 497, 144 S.E.2d at 613 (citations omitted). Unlike here, the operation and leasing of the hockey arena was not an effort at revitalizing the defendant's downtown area, nor were there any relevant statutes indicating that the defendant's activity was governmental in nature, nor was there any discussion of the fees charged and whether they covered the defendant's operating costs. Furthermore, plaintiff's proposition would be contrary to our mandate that "the proper designation of a particular action of a county or municipality is a fact intensive inquiry . . . and may differ from case to case." *Williams*, 366 N.C. at 203, 732 S.E.2d at 143.

After careful consideration of all the factors set forth in *Williams*, we conclude that—in light of the statutory indications that urban redevelopment activities undertaken to promote the health, safety, and welfare of North Carolina citizens are governmental functions, and the legislative determination that urban blight "cannot be effectively dealt with by private enterprise" alone, as well as the uncontroverted evidence: that defendant's lease of the historic property to the nonprofit Art Guild in order to promote the arts in the downtown area was a valid urban redevelopment and downtown revitalization activity; that defendant did not seek to make a profit; and that the fees charged by defendant were not substantial and did not cover its operating costs—defendant's activity here in leasing the property to the Art Guild so

as to promote the arts for the purpose of redeveloping and revitalizing the downtown area was a governmental function. Our decision should not be construed as holding that every urban redevelopment activity is a governmental function or even that every lease of historic property to a nonprofit arts group for the purpose of promoting the arts is a governmental function. Urban redevelopment and downtown revitalization activities defy straightforward definition, and such projects could seemingly cast a wide net encompassing a number of local government endeavors, many of which may be more commercial in nature or less geared towards remedying blighted areas and promoting the public interest than defendant's cooperative enterprise here with the Art Guild. We again emphasize that "the proper designation of a particular action of a county or municipality is a fact intensive inquiry . . . and may differ from case to case." *Id.* at 203, 732 S.E.2d at 143; *see also id.* at 203, 732 S.E.2d at 143 ("[I]t does not follow that a particular activity will be denoted a governmental function even though previous cases have held the identical activity to be of such a public necessity that the expenditure of funds in connection with it was for a public purpose." (quoting *Sides v. Cabarrus Mem'l Hosp., Inc.*, 287 N.C. 14, 22, 213 S.E.2d 297, 302 (1975) (emphasis omitted))). Because we conclude that the trial court correctly determined that defendant was engaged in a governmental function, we reverse the decision of the Court of Appeals. Because the Court of Appeals determined that defendant was not entitled to governmental immunity, it did not address whether the trial court correctly ruled that defendant did not waive

governmental immunity by purchasing liability insurance.  We remand this case to the Court of Appeals to address that issue.

As a final matter, this Court allowed discretionary review of an issue raised by both parties—whether the Court of Appeals correctly determined that defendant is not entitled to summary judgment as a matter of law on the issue of plaintiff's contributory negligence.  As to this issue, we hold that discretionary review was improvidently allowed.

REVERSED AND REMANDED; DISCRETIONARY REVIEW IMPROVIDENTLY ALLOWED IN PART.