IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-603

Filed 2 July 2025

Mecklenburg County, No. 21 CVS 007227-590

JON AND ALICIA BRADY, individually and as the Natural Parents and Legal Guardians of V.B., a minor, Plaintiffs,

v.

CHARLOTTE-MECKLENBURG BOARD OF EDUCATION, PLAYSPANISH, LLC, RICARDO L. MATA, PEGGY H. HEY, in her individual capacity, PHILLIP GOODMAN, in his individual capacity, and CYNTHIA MARRERO, in her individual capacity, Defendants.

Appeal by Defendants from order entered 2 April 2024 by Judge Karen Eady-Williams in Mecklenburg County Superior Court. Heard in the Court of Appeals 27 February 2025.

*Wallace Law Firm PLLC, by Terry L. Wallace, for Defendants-Appellants Charlotte-Mecklenburg Board of Education, Peggy H. Hey, Phillip Goodman, and Cynthia Marrero.*

*Susan L. Sowell for Defendant-Appellant Phillip Goodman.*

*No brief filed for Defendant PlaySpanish, LLC.*

*James, McElroy, & Diehl, P.A., by Preston O. Odom, III, J. Alexander Heroy, and Jennifer M. Houti, for Plaintiffs-Appellees.*

GRIFFIN, Judge.

Defendant Charlotte-Mecklenburg Board of Education ("Defendant CMS") and Defendants Peggy Hey, Phillip Goodman, and Cynthia Marrero appeal from the trial

court's order denying their motion to dismiss. Defendants claim they are immune from suit under the doctrines of governmental immunity and public official immunity. We hold they are not entitled to either defense and affirm the trial court's order.

## I. Factual and Procedural Background

Because this appeal comes to us from the denial of a motion to dismiss based on Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the North Carolina Rules of Civil Procedure, the following facts are taken from Plaintiffs' amended complaint and treated as true. *Est. of Long by and through Long v. Fowler*, 378 N.C. 138, 140–41, 861 S.E.2d 686, 690 (2021).

Defendant PlaySpanish is a limited liability company that has provided after-school language programming to students in Mecklenburg County since 1997. Defendant PlaySpanish ostensibly used public school facilities to conduct its business through the Charlotte-Mecklenburg Community Use in Schools program ("CUS"); however, Defendant CMS did not adhere to the CUS regulations and policies governing the program when providing Defendant PlaySpanish access to its facilities. CUS allows community organizations not affiliated with Defendant CMS to use its facilities for various civic purposes. Defendants Marrero, Goodman, and Hey were Defendant CMS's manager of CUS, Director of Property Management within the Facility Planning and Management section of the Operations Department, and Executive Director of the Facility Planning, respectively. All served in their respective positions during at least 2016, 2017, and 2018.

Defendant Ricardo Mata and his wife are the sole owners and proprietors of Defendant PlaySpanish. In October 2013, Defendant CMS received a report of Defendant Mata sexually assaulting a child at an elementary school while he was operating Defendant PlaySpanish. Defendant CMS requested its police division conduct a criminal background check on Defendant Mata, which showed Defendant Mata had been accused of multiple other assaults on both children and adult women between 1993 and 2009. The background check also revealed Defendant Mata had previously been extradited to Georgia because of an investigation for allegedly sexually assaulting a child there.

Following the allegation in October 2013, Defendant Mata met with Defendant CMS's superintendent and denied the allegations via email. Defendant CMS then closed its investigation of Defendant Mata and failed to inform its principals and students' parents about the results of their investigation and background check.

During the 2016–2017 and 2017–2018 school years, Plaintiffs enrolled their daughter in Defendant PlaySpanish while she was a kindergarten and first grade student. Defendant Mata sexually assaulted her numerous times during "lock-down drills," which he was not authorized to perform.

On 4 May 2021, Plaintiffs filed a complaint against Defendant PlaySpanish, Defendant Mata, Defendant CMS, and Defendants Hey, Goodman, and Marrero bringing numerous claims stemming from the assault on their daughter. On 29 July 2021, Plaintiffs amended their complaint. In part, Plaintiffs alleged Defendant CMS

and Defendants Hey, Goodman, and Marrero were liable for intentional or reckless infliction of emotional distress, negligent infliction of emotional distress, and negligence or gross negligence.[1]  Plaintiffs also brought a claim against Defendant CMS for premises liability and, in the alternative, under Article I, section 19 the North Carolina State Constitution.

Defendant CMS and Defendants Hey, Goodman, and Marrero moved to dismiss Plaintiffs' amended complaint on 8 September 2021 pursuant to Rules 12(b)(1), (2), and (6), claiming Defendant CMS is entitled to governmental immunity and Defendants Hey, Goodman, and Marrero are entitled to public official immunity. Defendants attached affidavits and evidentiary exhibits in support of their motion. Plaintiffs filed a memorandum of law opposing Defendants' motion and also submitted an affidavit and exhibits to the trial court.

On 23 June 2022, Defendants' motion came on for hearing in Mecklenburg County Superior Court.  The trial court did not receive evidence during the hearing. On 2 April 2024, the trial court dismissed Plaintiffs' constitutional claim but denied Defendants' motion as to all other claims.  Specifically, the trial court concluded Plaintiffs' allegations were sufficient to survive Defendants' motion to dismiss, and

---

[1] As this appeal only addresses Defendant CMS and Defendants Hey, Goodman, and Marrero's motion to dismiss, we do not list or discuss the remaining claims against Defendant PlaySpanish and Defendant Mata.

the issue of whether Defendants were entitled to the respective immunities they claimed required further factual development.

Defendants timely appeal.

## II. Analysis

Defendants contend the trial court erred by denying their motion to dismiss on Plaintiffs' remaining claims. Specifically, Defendant CMS argues it is entitled to governmental immunity because it was engaged in a governmental function when allowing Defendant PlaySpanish to use its facilities and did not purchase liability insurance waiving immunity. Taking the facts alleged in the amended complaint as true, we hold Defendant CMS was engaged in a propriety function, thereby waiving governmental immunity. Therefore, we do not reach the question of whether the insurance policies at issue also had the same effect.

Defendants Hey, Goodman, and Marrero argue they enjoy public official immunity and are therefore also immune from liability. We similarly hold that Defendants Hey, Goodman, and Marrero were not acting as public officials and are therefore not entitled to its protections.

## A. Jurisdiction

Defendants moved to dismiss Plaintiffs' claims under Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Civil Procedure. Generally, a trial court's decision to deny a Rule 12 motion to dismiss is interlocutory and not immediately appealable. *Can Am S., LLC v. State*, 234 N.C. App. 119, 122, 759 S.E.2d 304, 307 (2014) (citing

*Reid v. Cole*, 187 N.C. App. 261, 263, 652 S.E.2d 718, 719 (2007)). However, an immediate right of appeal exists where the order affects a substantial right or is an adverse ruling on personal jurisdiction. *Can Am S.,* 234 N.C. App. at 122, 759 S.E.2d at 307.

Being so, an order denying a motion to dismiss made pursuant to Rule 12(b)(6) because of governmental immunity is immediately appealable as it affects a substantial right; governmental immunity "is an immunity from suit rather than a mere defense to liability; and . . . it is effectively lost if a case is erroneously permitted to go to trial." *Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337–38, 678 S.E.2d 351, 354 (2009); *see also State ex rel. Stein v. Kinston Charter Acad.*, 379 N.C. 560, 571, 866 S.E.2d 647, 655 (2021) ("[A] municipal corporation may assert governmental immunity[] as a complete defense to a civil lawsuit at the pleading stage."); *Can Am*, 234 N.C. at 122, 759 S.E.2d at 307 ("Had defendants moved to dismiss based on the defense of sovereign immunity pursuant to Rule 12(b)(6), we would be bound by the longstanding rule that the denial of such a motion affects a substantial right and is immediately appealable under section 1-277(a)." (citations omitted)).

Similar to a Rule 12(b)(6) dismissal based on sovereign immunity, we have consistently held "denial of a Rule 12(b)(2) motion premised on sovereign immunity constitutes an adverse ruling on personal jurisdiction and is therefore immediately appealable under section 1-277(b)." *Green v. Howell*, 274 N.C. App. 158, 164, 851

S.E.2d 673, 678 (2020) (citation and internal marks omitted); *see also Torres v. City of Raleigh*, 288 N.C. App. 617, 620, 887 S.E.2d 429, 433 (2023) ("This Court has consistently stated that a denial of governmental immunity should be classified as an issue of personal jurisdiction under Rule 12(b)(2)."); *Can Am*, 234 N.C. App. at 123–24, 759 S.E.2d at 308 ("[T]his Court has consistently held that: (1) the defense of sovereign immunity presents a question of personal, not subject matter, jurisdiction, and (2) denial of Rule 12(b)(2) motions premised on sovereign immunity are sufficient to trigger immediate appeal under section 1-277(b).").

Like governmental and sovereign immunity, public official immunity "is more than a mere affirmative defense to liability—it shields a defendant entirely from having to answer for its conduct in a civil suit for damages." *Est. of Graham v. Lambert*, 385 N.C. 644, 651, 898 S.E.2d 888, 895 (2024) (citations omitted). Because public official immunity provides a defendant a complete shield, a trial court's ruling denying a Rule 12(b)(6) motion to dismiss based upon public official immunity is also immediately appealable as affecting a substantial right because "'it is effectively lost if a case is erroneously permitted to go to trial.'" *Craig*, 363 N.C. at 337–38, 678 S.E.2d at 354 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411, 425 (1985)); *see also Bartley v. City of High Point*, 381 N.C. 287, 293, 873 S.E.2d 525, 532 (2022) ("The denial of summary judgment on the ground of public official immunity is immediately appealable because it affects a substantial right.").

We will not, however, review whether the trial court properly denied

Defendants' motion on the basis of Rule 12(b)(1) as "that motion does not support an interlocutory appeal." *Murray v. Univ. of N.C. at Chapel Hill*, 246 N.C. App. 86, 93, 782 S.E.2d 531, 536 (2016) (citation omitted); *Green v. Kearney*, 203 N.C. App. 260, 265–66, 690 S.E.2d 755, 760 (2010) ("Nevertheless, this Court has declined to address interlocutory appeals of a lower court's denial of a Rule 12(b)(1) motion to dismiss despite the movant's reliance upon the doctrine of sovereign immunity.").

In sum, the issues of whether the trial court properly denied Defendants' motion to dismiss because of governmental immunity and public official immunity are properly before this Court as an adverse ruling on personal jurisdiction and as affecting a substantial right.

**B. Defendant CMS**

Defendant CMS contends the trial court erred by denying its motion to dismiss because it is protected by governmental immunity from lawsuits alleging tortious or negligent conduct. Plaintiffs argue Defendant CMS does not benefit from the protections provided by governmental immunity for two reasons: (1) Defendant CMS was engaging in a proprietary function when it allowed Defendant PlaySpanish to use its facilities; and (2) Defendant CMS waived governmental immunity by purchasing insurance which covers Plaintiffs' claims. Either ground provides an adequate basis for affirming the trial court's order because Defendant CMS is subject to the court's personal jurisdiction if not protected by governmental immunity. We agree with Plaintiffs that Defendant CMS was engaged in a proprietary function

when allowing Defendant PlaySpanish on school property and therefore do not reach the issue of whether Defendant CMS waived governmental immunity through purchasing insurance.

"This Court has consistently stated that a denial of governmental immunity should be classified as an issue of personal jurisdiction under Rule 12(b)(2)." *Torres*, 288 N.C. App. at 620, 887 S.E.2d at 433 (2023). "The standard of review to be applied by a trial court in deciding a motion under Rule 12(b)(2) depends upon the procedural context confronting the court." *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693, 611 S.E.2d 179, 182 (2005). Three postures are typical: "(1) the defendant makes a motion to dismiss without submitting any opposing evidence; (2) the defendant supports its motion to dismiss with affidavits, but the plaintiff does not file any opposing evidence; or (3) both the defendant and the plaintiff submit affidavits addressing the personal jurisdiction issues." *Id*; *Torres*, 288 N.C. App. at 620–21, 887 S.E.2d at 433 (stating the same).

In the third posture, such as here, "the court may hear the matter on affidavits presented by the respective parties, or the court may direct that the matter be heard wholly or partly on oral testimony or depositions." *Banc of Am. Sec.*, 169 N.C. App. at 694, 611 S.E.2d at 183 (citation modified). Because the trial court here did not receive evidence at the hearing but decided the motion based upon the pleadings and affidavits alone, it acted much like a juror by "'determin[ing] the weight and sufficiency of the evidence[.]'" *Id*. (quoting *Fungaroli v. Fungaroli*, 51 N.C. App. 363,

367, 276 S.E.2d 521, 524 (1981)). Our review in this context is to determine "only 'whether the findings of fact by the trial court are supported by competent evidence in the record; if so, this Court must affirm the order of the trial court.'" *Banc of Am. Sec.*, 169 N.C. App. at 694, 611 S.E.2d at 183 (quoting *Replacements, Ltd. v. MidweSterling*, 133 N.C. App. 139, 140–41, 515 S.E.2d 46, 48 (1999)). But, a trial court "is not required to make specific findings of fact unless a party so requests." *McCullers v. Lewis*, 265 N.C. App. 216, 220, 828 S.E.2d 524, 530–31 (2019) (citations omitted). When the record does not indicate a party requested "the trial court make specific findings of fact, and the order appealed from contains no findings, we presume that the trial court made factual findings sufficient to support its ruling[,]" and we determine from a review of the record whether there is evidence "that would support the trial court's legal conclusions[,]" which are reviewed de novo. *Id.* (citations omitted).

Here, the trial court's order did not contain findings of fact, nor did either party request them, so we "presume that the trial court found facts sufficient to support its ruling, if such findings may be made from the record evidence." *Torres*, 288 N.C. App. at 622–23, 887 S.E.2d at 434 (citing *Cameron-Brown Co. v. Daves*, 83 N.C. App. 281, 285, 350 S.E.2d 111, 114 (1986)). In sum, we review the record to determine whether there was adequate evidence to support the trial court's conclusions of law, which we then review de novo. *Id.*

Sovereign immunity is a common law doctrine which "bars suits against the

State 'unless it has consented or waived its immunity.'" *Graham*, 385 N.C. at 651, 898 S.E.2d at 895 (quoting *Kinston Charter Acad.*, 379 N.C. at 570, 866 S.E.2d at 655 (internal marks omitted)). Constituent units of the State—cities, counties, and other localities such as school boards—are protected by governmental immunity, a "slice" of sovereign immunity which "shields units of local government from suit for acts committed in their *governmental* capacity." *Graham*, 385 N.C. at 651, 898 S.E.2d at 895–96 (quoting *Providence Volunteer Fire Dep't, Inc. v. Town of Weddington*, 382 N.C. 199, 211–12, 876 S.E.2d 453 (2022) (internal marks omitted) (emphasis added)); *see also Willet v. Chatham Cnty. Bd. of Educ.*, 176 N.C. App. 268, 269, 625 S.E.2d 900, 901 ("School boards enjoy the right of governmental immunity absent waiver or a statute to the contrary."); *Hallman v. Charlotte-Mecklenburg Bd. of Educ.*, 124 N.C. App. 435, 437, 477 S.E.2d 179, 180 (1996) ("A local board of education is immune from suit and may not be liable in a tort action unless the Board has duly waived its governmental immunity.").

Two ways a school board may waive governmental immunity are by purchasing liability insurance, N.C. Gen. Stat. § 115C-42 (2023), or when engaging in a proprietary, as opposed to governmental, function, *Kinston Charter Acad.*, 379 N.C. at 571, 866 S.E.2d at 655; *see also Willett*, 176 N.C. App. at 270, 625 S.E.2d at 902 ("Governmental immunity shields a state entity in the performance of governmental functions, but not proprietary functions." (citing *Hickman v. Fuqua*, 108 N.C. App. 80, 82–83, 422 S.E.2d 449, 451 (1992)).

Our Supreme Court has explained the difference between governmental and proprietary acts undertaken by localities as one in which the locality's motivation, and characteristics of the acts, are determinative:

> [a]ny activity of a municipality which is discretionary, political, legislative, or public in nature and performed for the public good in behalf of the State rather than for itself comes within the class of governmental functions. When, however, the activity is commercial or chiefly for the private advantage of the compact community, it is private or proprietary.

*Bynum v. Wilson Cnty.*, 367 N.C. 355, 358, 758 S.E.2d 643, 646 (2014) (quoting *Britt v. City of Wilmington*, 236 N.C. 446, 450, 73 S.E.2d 289, 293 (1952)).   Stated differently, the protections of governmental immunity end where a unit of local government "'undertakes functions beyond its governmental and police powers and engages in business in order to render a public service for the benefit of the community for a profit, it [then] becomes subject to liability for contract and in tort as in [the] case of private corporations.'" *Providence*, 382 N.C. at 212, 876 S.E.2d at 462 (quoting *Kinston Charter Acad.*, 379 N.C. at 571, 866 S.E.2d at 655).

Our Supreme Court has "adopted a three-step method of analysis for use in determining whether a [local unit of government's] action was governmental or proprietary in nature." *Providence* 382 N.C. at 212–13, 876 S.E.2d at 462 (citing *Est. of Williams ex rel. Overton v. Pasoquotank Cnty. Parks & Recreation Dept.*, 366 N.C. 195, 200, 732 S.E.2d 137, 141 (2014)).   The first step, and threshold inquiry, requires us to consider "whether, and to what degree, the legislature has addressed the issue."

*Williams*, 366 N.C. at 200, 732 S.E.2d at 141–42.

If the legislature has not designated a function as governmental, we then ascertain whether the act is one that "can only be provided by a governmental agency or instrumentality[,]" because, if it is, then the act is necessarily a governmental function. *Bynum*, 367 N.C. at 358–59, 758 S.E.2d at 646. This factor "has limitations in our changing world [because] many services once thought to be the sole purview of the public sector have been privatized in full or in part. Consequently, it is increasingly difficult to identify services that can only be rendered by a governmental entity." *Providence*, 382 N.C. at 213, 876 S.E.2d at 462 (quoting *Williams*, 366 N.C. at 202–03, 732 S.E.2d at 137 (citation modified)).

In light of this increasingly difficult reality, if neither of the first two inquiries is dispositive, we then look to "a number of additional factors, of which no single factor is dispositive." *Williams*, 366 N.C. at 202, 732 S.E.2d at 143. Those factors include "whether the service is traditionally a service provided by a governmental entity, whether a substantial fee is charged for the service provided, and whether the fee does more than simply cover the operating costs of the service provider." *Id.* at 202–03, 732 S.E.2d at 143 (citation omitted). When analyzing these factors, we focus on "the governmental act or service that was allegedly done in a negligent manner." *Bynum*, 367 N.C. at 359, 758 S.E.2d at 646 (citing *Williams*, 366 N.C. at 199, 732 S.E.2d at 141). Moreover, "the distinctions between proprietary and governmental functions are fluid" and our Supreme Court has cautioned "against overreliance on"

the factors. *Providence*, 382 N.C. at 213, 876 S.E.2d at 462–63 (quoting *Williams*, 366 N.C. at 202–03, 732 S.E.2d at 143)).

At bottom, this analysis "is a fact intensive inquiry, turning on the facts alleged in the complaint, and may differ from case to case." *Williams*, 366 N.C. at 203, 732 S.E.2d at 143.

Here, Defendant CMS contends the trial court erred by failing to address this factor in its order dismissing their 12(b)(2) motion. Regardless, Defendant CMS argues the first factor of *Williams* is dispositive because the Community Schools Act authorized Defendant CMS to provide for-profit businesses use of school facilities and therefore the General Assembly has designated that a governmental function. Specifically, Defendant cites to *Bynum v. Wilson County* and *Bellows v. Asheville City Board of Education* as analogs in favor of their argument.

In *Bynum*, the plaintiff sued Wilson County for various tort claims after he fell down the steps of a building housing the county government's offices. 367 N.C. at 359–60, 758 S.E.2d at 646. In determining whether maintenance of the building was a proprietary or governmental function, our Supreme Court relied on section 153A-169, which stated "[t]he board of commissioners shall supervise the maintenance, repair, and use of all county property." *Id.* at 360, 758 S.E.2d at 646–47. Specifically, the Court held that because the General Assembly "specifically assigned to the county government the responsibilities of locating, supervising, and maintaining" the building where the plaintiff fell, and because the building housed the offices for the

- 14 -

county's "discretionary, legislative, and public functions[,]" which could only be provided by the government, the General Assembly had designated maintenance of the building as governmental. *Id.* at 360–61, 758 S.E.2d at 646–47.

In *Bellows*, the plaintiff and her husband brought claims against the Asheville City Board of Education for negligence after the plaintiff fell out of her wheelchair and sustained injuries while at Asheville High School. 243 N.C. App. 229, 230, 777 S.E.2d 522, 523 (2015). Relying on *Bynum*, we held sections 115C-40 and 115C-521(c), which both directed that school boards shall maintain and repair their property, indicated the "General Assembly's assignment" of these responsibilities was dispositive to the question of whether property maintenance was a governmental or proprietary function. *Id.* at 232, 777 S.E.2d at 524.

Because the test for whether a function is governmental or proprietary requires a fact-intensive inquiry, we do not find these cases persuasive here for the reasons below. Additionally, it is a well settled principle of law "'that where the language of a statute is clear and unambiguous, there is no room for judicial construction and [we] must construe the statute using its plain meaning.'" *Kinston Charter Acad.*, 379 N.C. at 572, 866 S.E.2d at 656 (quoting *In re Est. of Lunsford*, 359 N.C. 382, 391–92, 610 S.E.2d 366 (2005)).

Here, the Community Schools Use Act ("The Act") encourages "greater community involvement in the public schools and greater community use of public school facilities" and requires school boards to "[d]evelop programs and plans for

increased use of public school facilities based upon policies and guidelines adopted by the State Board of Education." N.C. Gen. Stat. §§ 115C-204; 207(2) (2023). The Act also requires school boards to "[e]stablish rules governing the implementation of such programs and plans in its public schools and submit these rules along with adopted programs and plans to the State Board of Education for approval" by the same. N.C. Gen. Stat. § 115C-207(3). Notably, the Act includes allowing use of school facilities for programs "including tutoring[.]" N.C. Gen. Stat. § 115C-206(2) (2023).

Per record evidence, Defendant CMS, pursuant to this authority, adopted regulations providing for "Commercial Group[s]" to use CMS facilities "to engage in a profit-making enterprise[.]" The regulations also provided that non-profit organizations would be preferred over for-profit organizations during the approval process, and the fee chart required higher payments by for-profit groups as well. Additionally, Defendant CMS discouraged the use of school facilities by for-profit groups.

This being the statutory and subsequent regulatory context, we do not agree the General Assembly has addressed whether a school board's renting of school properties to for-profit businesses is a governmental or proprietary function. The Act is a broad grant of authority and empowers school boards to allow community organizations within their schools. However, the Act is silent about the use of school facilities by for-profit businesses. In contrast, in both *Bynum* and *Bellows*, the statutory mandates relied upon directly addressed the function at issue: maintenance

of government property.  Moreover, we read the Act's explicit authorization for "[t]he use of public school facilities by governmental, charitable, or civic organizations" to be consistent with Defendant CMS's own policy of preferring non-profit organizations to use school facilities over for-profit organizations.  This weighs against characterizing the use of school facilities by for-profit businesses as a governmental function because that section seemingly promotes use by non-profit organizations.

The Act does indicate that it is a policy of the State "[t]o assure maximum use of public school facilities by the citizens of each community in this State[,]" which is indicative of it being a governmental function for a school board to allow all kinds of outside organizations to use school facilities.  *See Williams*, 366 N.C. at 200, 732 S.E.2d at 141 (holding the following emphasized statutory language, "providing of safe and sanitary dwelling accommodations for persons of low income are *public uses and purposes for which public money may be spent* and private property acquired" to be a "significant statutory indication" of a government function) (citation modified)).  Additionally, the Act requires that local school boards "[d]evelop policies and/or procedures for approving the use of volunteer organizations and for approving the use of individual volunteers[;]" and "[d]evelop programs and plans for increased community use of public school facilities based upon policies and guidelines adopted by the State Board of Education[;]" and "[e]stablish rules governing the implementation of such programs and plans in its public schools[.]"  N.C. Gen. Stat. § 115C-207(1)–(3).

But, based on the record developed to this point, it is unclear whether Defendant Mata was acting in the capacity of a volunteer under this authorization. Our standard of review directs us to presume the trial court found sufficient facts to support the conclusion that he was, and therefore Defendant CMS was negligent in allowing him access to its facilities and young children. Regardless, these statutes seemingly provide for the general conduct at issue and are indicative of a governmental function—allowing outside organizations to operate in public school facilities—but even if "the legislature has designated a general activity to be 'a governmental function by statute, the question remains whether the specific activity at issue, in this case and under these circumstances, is a governmental function." *Meinck v. City of Gastonia*, 371 N.C. 497, 513–14, 819 S.E.2d 353, 364 (2018) (quoting *Williams*, 366 N.C. at 201, 732 S.E.2d at 142). But we reiterate, in contrast to *Bynum* and *Bellows*, these mandates do not directly address or require school boards to engage in the specific activity and function at issue: allowing for-profit businesses to use its facilities for profit making activities.

Defendant CMS also directs us to section 115C-524 of the North Carolina General Statutes in support of it's contention that the General Assembly has resolved the question of whether allowing for-profit groups to use school facilities is a governmental or proprietary function. Section 115C-524, "Repair of school property; use of buildings for other than school purposes[,]" allows local school boards to enter into agreements "permitting non-school groups to use school real and personal

- 18 -

property [] for other than school purposes so long as such use is consistent with the proper preservation and care of the public school property." N.C. Gen. Stat. § 115C-524(c) (2023). The statute then goes on to say, and Defendant emphasizes, "[n]o liability shall attach to any board of education or to any individual board member for personal injury suffered by reason of the use of such school property pursuant to such agreements." *Id.*

We do not read that language to be a legislative insulation of liability from injury suffered by all uses of school facilities. Rather, reading the statute in totality, the plain language of the statute refers to injuries caused by *use of property*; not injuries caused by a business proprietor conducting their business *on the property*. *See Henderson v. Charlotte-Mecklenburg Bd. of Educ.*, 253 N.C. App. 416, 421, 801 S.E.2d 145, 149 (2017) (holding the defendant maintained statutory immunity pursuant to section 115C-524(c) where an individual fell down because of a property defect while present on the property pursuant to an agreement made under the statute).

Additionally, section 115C-524(c) provides for school boards to enter into agreements with businesses, and thus represents a legislative intent to have an executed contract on file prior to facility use. This cuts against Defendant CMS's argument in that Defendant CMS did not require an executed contract before allowing Defendant PlaySpanish to use school facilities. Moreover, had the General Assembly intended what Defendant CMS argues, it would have an included a section

to such effect in the Act pursuant to which Defendant PlaySpanish operated under. Instead, the Act seemingly contemplates lawsuits of this kind. Specifically, in the section discussing the maintenance of volunteer records, meaning "[a]n individual who provides services to a local board of education without expectation of compensation and with the understanding that the local board of education is under no obligation to continue accepting those services or to compensate the volunteer for them[,]" the Act states volunteer records should be kept confidential except for inspection by "[a] party to a lawsuit, by authority of a subpoena or proper court order[.]" N.C. Gen. Stat. § 115C-209.1(e)(1), (a)(5) (2023). This language, in contrast to that above, is indicative of the General Assembly's intent that activities provided under the Act would not benefit from governmental immunity.

So, the General Assembly "has not directly resolved whether" the activity here is a governmental function and we proceed to the second factor of the analysis. *Williams*, 366 N.C. at 202, 732 S.E.2d at 142.

The second factor requires determination of whether the activity "is necessarily governmental in nature [because] it can only be provided by a governmental agency or instrumentality." *Id.* "[T]his principle has limitations" because many services that were traditionally provided by the government have been privatized and can now be offered by commercial businesses. *Id.* at 202, 732 S.E.2d at 143. This being the case, if a "particular service can be performed both privately and publicly, the inquiry involves consideration" of additional factors, none of which

are dispositive. *Id*.

Defendant contends the activity here is governmental in nature because only the government can make school property available for public use. We disagree with this characterization and hold that, in this context, public school facilities are a subset of government owned real property placed into the commercial market by Defendant CMS allowing businesses to use them for profit making activities.

In *Kiddie Korner*, the owners and operators of day care centers in Charlotte filed suit bringing numerous claims against the Charlotte-Mecklenburg School Board after the school board adopted a proposal made by its superintendent for an after-school program at Dilworth Elementary School. 55 N.C. App. 134, 135–36, 285 S.E.2d 110, 112 (1981). There, the school board established a committee comprised of "a representative from the Dilworth staff, parents, and the Dilworth Ministerial Association," which then implemented the proposal and administered the program. *Id*. at 136, 285 S.E.2d at 112. We did not address the issue of governmental immunity but characterized the program "in terms of an educational service *operated by a school sponsored committee*." *Id*. at 137, 285 S.E.2d at 113 (emphasis added).

In *Schmidt*, we relied upon *Kiddie Korner* in adjudicating a dispute where the plaintiffs' minor son suffered a head injury while attending an "after-school enrichment program operated and controlled by Charlotte-Mecklenburg Board of Education at the Idlewild Elementary School." 134 N.C. App. 248, 250, 517 S.E.2d 171, 173 (1999) (citation modified). Plaintiffs claimed the school board was negligent

in its operation of the after-school program and waived governmental immunity, in part, by engaging in a proprietary function. *Id.* at 250–51, 517 S.E.2d at 173. We determined the program in *Kiddie Korner* was indistinguishable from the program there and held the Idlewild program was "an undertaking traditionally provided by the local governmental units . . . and correctly classified as a supplemental educational experience." *Id.* at 254, 517 S.E.2d at 175 (citation modified).

Unlike the programs offered in *Kiddie Korner* and *Schmidt*, here record evidence shows the educational service was operated by a private, for-profit corporation—not by the school board or a constituent committee. This distinction necessarily leads us to the conclusion that this "particular service[, providing facilities to a for-profit tutoring business,] can be performed both privately and publicly." *Williams*, 366 N.C. at 202, 732 S.E.2d at 143. Because of this, we proceed to analyze the remaining factors of whether: (1) "the service is traditionally a service provided by a governmental entity[;]" (2) "a substantial fee is charged for the service provided[;]" and (3) "the fee does more than simply cover the operating costs of the service provider." *Id.* at 202–03, 732 S.E.2d at 143. But, we remain cognizant that our Supreme Court has cautioned against overreliance on these factors because the distinction "between proprietary and governmental functions [is] fluid" and we remain "advertent to changes in practice." *Id.* at 203, 732 S.E.2d at 143. Additionally, our Supreme Court has emphasized the following two principles important here:

First, although an activity may be classified in general as

> a governmental function, liability in tort may exist as to certain of its phases; and conversely, although classified in general as proprietary, certain phases may be considered exempt from liability. Second, it does not follow that a particular activity will be denoted a governmental function even though previous cases have held the identical activity to be of such a public necessity that the expenditure of funds in connection with it was for a public purpose.

*Id.* (quoting *Sides v. Cabarrus Mem'l Hosp., Inc.*, 287 N.C. 14, 21–22, 213 S.E.2d 297, 302 (1975)).

Here, providing educational opportunities has traditionally been a service provided by local government entities. *Schmidt*, 134 N.C. App. at 250, 517 S.E.2d at 173. However, in compliance with our duty to heed changes in practice, we also recognize Defendant CMS still allows use of its properties for programs similar to those at issue in *Schmidt* and *Kiddie Korner* through its After-School Enrichment Program. *See* Before and After School Programs, https://www.cmsk12.org/asep (last visited 8 May 2025); *see also Williams*, 366 N.C. at 203, 732 S.E.2d at 143 ("First, although an activity may be classified in general as a governmental function, liability in tort may exist as to certain of its phases[.]" (citation omitted)). The record indicates Defendant PlaySpanish did not operate pursuant to such. Because of this reality, the characterization we made over twenty years ago in *Kiddie Korner* holds significantly less, if any, weight here.

Moreover, record evidence received by the trial court indicates Defendant CMS generally charged higher fees when allowing for-profit entities to use its facilities.

Defendant CMS's policies state that the reason it charges for-profit applicants higher fees is to "avoid unfair competition with other commercial enterprises." Thus, by its own characterization, Defendant CMS's activity here was in the commercial, not governmental, sphere because it was providing a service which could compete with other commercial enterprises. *See Britt*, 236 N.C. 446, 451, 73 S.E.2d at 293 (describing a proprietary function as one that "any corporation, individual, or group of individuals could do"). As such, Defendant CMS essentially stepped into the shoes of a landlord renting property to a company when it allowed Defendant PlaySpanish to operate its business on school property.

While Defendant CMS, as the Plaintiffs allege and the record indicates, waived fees in excess of $35,000 for Defendant PlaySpanish during multiple years that Defendant PlaySpanish operated on their property, this was because Defendant CMS violated its own policies. This fact, and the argument Defendant CMS makes upon it, misses the forest for the trees. Specifically, emails from Defendant Marrero reflect Defendant CMS allowed Defendant PlaySpanish and other organizations to operate within its facilities without a contract for years and, after the Community Use of Schools Committee discovered this discrepancy, waived fees for subsequent years until changes in their policies were approved.

Essentially, Defendant PlaySpanish should not have been allowed to operate in the facilities during those years without a contract had Defendant CMS adhered to its own policies. Like a business that offers a refund to a customer after making

an error, the fee waiver came about from Defendant CMS's own erroneous conduct. Moreover, Defendant CMS planned on requiring Defendant PlaySpanish to obtain approval and begin paying the fees moving forward despite Defendant PlaySpanish not costing the district any additional expense. *See Evans v. Housing Authority of City of Raleigh*, 359 N.C. 50, 54, 602 S.E.2d 668, 671 ("A fee suggests that an activity is proprietary, particularly if a profit results." (citation modified)). Had Defendant CMS abided by its own policies, Defendant PlaySpanish would have been paying fees for years despite Defendant CMS incurring no expense, thus making a profit. In consequence, we do not consider the absence of profit here to be of significance.

We do note, however, the fact that Defendant CMS was not motivated by making a profit, even though it would have had it abided by its policies, favors characterizing the activity as a governmental function. *See Meinck*, 371 N.C. at 515, 819 S.E.2d at 365 (acknowledging the City of Gastonia did not seek to make a profit when analyzing this factor).

In totality, Defendant CMS would have charged Defendant PlaySpanish a substantial fee in relation to its expense had it not strayed from its own policies. Moreover, the contrast between the programs operating pursuant to the After-School Enrichment Program, which fit squarely within the holdings of *Schmidt* and *Kiddie Korner*, and the program here operating for a profit without an executed contract also show this was not the kind of activity that has been traditionally provided by government entities. We hold Defendant CMS, based upon the facts developed and

evidence received upon Defendants' 12(b) motions, was engaged in a proprietary function when it allowed a for-profit tutoring company to use its facilities when conducting its business.

In this context, the protections provided by governmental immunity do not deprive the trial court of personal jurisdiction over Defendant CMS. *See Providence*, 382 N.C. at 231, 876 S.E.2d at 474 ("When a governmental entity exercises proprietary functions without the requisite integrity, shielding it in immunity produces a serious injustice." (Barringer, J., concurring in part and dissenting in part)). Accordingly, we affirm the trial court's order denying Defendant CMS's 12(b)(2) motion to dismiss. Because Defendant CMS waiving the protections of governmental immunity through engaging in a proprietary function is sufficient to uphold the trial court's order on Defendants' 12(b) motion, we do not reach the question of whether governmental immunity was also waived through the purchasing of insurance.

## C. Defendants Hey, Goodman, and Marrero

Defendants Hey, Goodman, and Marrero contend the trial court erred by failing to grant their motion to dismiss because they are public officials immune from liability for acts of negligence. Plaintiffs argue Defendants Hey, Goodman, and Marrero are merely public employees and therefore not entitled to immunity. We agree with Plaintiffs and affirm the trial court's order denying Defendant Hey, Goodman, and Marrero's 12(b)(6) motion to dismiss.

We review a trial court's decision on a Rule 12(b)(6) motion de novo to determine "whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." *Kinston Charter Acad.*, 379 N.C. at 572, 866 S.E.2d at 656 (citation and internal marks omitted). "'Rule 12(b)(6) generally precludes dismissal except in those instances where the face of the complaint discloses some insurmountable bar to recovery.'" *Id.* (quoting *Newberne v. Dep't of Crime Control & Pub. Safety*, 359 N.C. 782, 784, 618 S.E.2d 201, 203–04 (2005)). Public official immunity is one such insurmountable bar because "it shields a defendant entirely from having to answer for its conduct in a civil suit for damages." *Est. of Graham*, 385 N.C. at 651, 898 S.E.2d at 895 (citations omitted). Pursuant to de novo review, we "consider the matter anew and freely substitute our judgment for that of the trial court." *Matter of K.S.*, 380 N.C. 60, 64, 868 S.E.2d 1, 4 (2022) (citation modified).

Plaintiffs sued Defendants Goodman, Hey, and Marrero in their individual capacity because the complaint names them in their individual capacity and Plaintiffs are seeking a monetary remedy. *See Fowler*, 378 N.C. at 144–45, 861 S.E.2d at 692 (explaining the implication of these two factors when determining whether a person has been sued in their individual or official capacity). Being so, Defendants Hey, Goodman, and Marrero do not enjoy the protection of governmental immunity. *Graham*, 385 N.C. at 654, 898 S.E.2d at 897. But, defendants sued in their individual capacity "are not left unshielded—they may assert 'personal immunity defenses.'" *Id.*

(quoting *Moore v. City of Greensboro*, 345 N.C. 356, 368, 481 S.E.2d 14, 14 (1997)).

Public official "immunity is one such personal defense." *Id.* Public official immunity is a judicially created doctrine which "shields public officials from personal liability for claims arising from discretionary acts or acts constituting mere negligence, by virtue of their office, and within the scope of their governmental duties." *Bartley*, 381 N.C. at 294, 873 S.E.2d at 533 (2022). This immunity is founded upon two societal concerns: first, it allows for "fearless, vigorous, and effective administration of government policies[,]" and second, it encourages competent individuals to assume the responsibilities of public office without fear of incurring liability for actions taken when executing those duties. *Id.* (citations and internal marks omitted). This doctrine does not, however, "immunize conduct at odds with the protections afforded by it and that underlie its utility." *Graham*, 385 N.C. at 654, 898 S.E.2d at 897–98 (citation modified). To this end, public officials are not immune from liability if their "action was (1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Bartley*, at 294, 873 S.E.2d at 533 (citation and internal marks omitted). But, we presume a public official discharges their duties in good faith. *Id.* at 295, 873 S.E.2d at 533 (citation omitted).

In contrast to public officials, public employees may be held liable for negligence. *Meyer v. Walls*, 347 N.C. 97, 112, 489 S.E.2d 880, 887 (1997). Our State recognizes three "basic distinctions between a public official and a public employee, including: (1) a public office is a position created by the constitution or statutes; (2) a

- 28 -

public official exercises a portion of the sovereign power; and (3) a public official exercises discretion, while public employees perform ministerial duties." *Isenhour v. Hutto,* 350 N.C. 601, 610, 517 S.E.2d 121, 127 (1999).

"A position is considered created by statute when the officer's position has a clear statutory basis or the officer has been delegated a statutory duty by a person or organization created by statute or the Constitution." *Baker v. Smith*, 224 N.C. App. 423, 428, 737 S.E.2d 144, 148 (2012) (citation modified). "[W]here a statute expressly creates the authority to delegate a duty, a person or organization who is delegated and performs the duty on behalf of the person or organization in whom the statute vest the authority to delegate passes the first *Isenhour* factor." *McCullers*, 265 N.C. App. at 223, 828 S.E.2d at 532 (citing *Baker*, 224 N.C. App. at 428–30, 737 S.E.2d at 148–49). But, the delegation must be of "some portion of the sovereign power to the position holder." *Hwang v. Cairns*, __ N.C. __, __ S.E.2d __, 2025 WL 1479020, *4 (2025).

Ministerial duties "are absolute and involve merely the execution of a specific duty arising from fixed and designated facts[,]" while discretionary duties "are those requiring personal deliberation, decision and judgment." *Isenhour*, 350 N.C. at 610, 517 S.E.2d at 127 (citation modified). "Courts applying this framework have recently held that a defendant seeking to establish public official immunity must demonstrate that all three of the *Isenhour* factors are present." *McCullers*, 265 N.C. App. at 222–23, 828 S.E.2d at 532 (citing *Leonard v. Bell*, 254 N.C. App. 694, 705, 803 S.E.2d 445,

453 (2017)).

Defendants Hey, Goodman, and Marrero contend they are entitled to public official immunity because their positions have "a clear statutory basis." They cite to the Act in support of their argument that they are "Community Schools Coordinators."

The Act defines a "Community Schools Coordinator" as "an employee of a local board of education whose responsibility it is to promote and direct maximum use of the public schools and public school facilities as centers for community development[,]" and states that local school boards "may provide for the . . . employment of one or more [C]ommunity [S]chools [C]oordinators." N.C. Gen. Stat. § 115C-205(2); 207 (2023). The Act also provides the duties of Community Schools Coordinators:

> Every local board of education may employ one or more [C]ommunity [S]chools [C]oordinators and shall establish the terms and conditions of their employment. Community [S]chools [C]oordinators shall be responsible for:
>
> (1) Providing support to the [C]ommunity [S]chools [A]dvisory [C]ouncils and public school officials.
>
> (2) Fostering cooperation between the local board of education and appropriate community agencies.
>
> (3) Encouraging maximum use of community volunteers in the public schools.
>
> (4) Performing any other duties as may be assigned by the local superintendent and the local board of education, consistent with the purposes of this Article.

N.C. Gen. Stat. § 115C-209 (2023).

Here, whether Defendants Hey, Goodman, and Marrero were Community Schools Coordinators as contemplated by the Act in their respective positions as manager of Defendant CMS's CUS program, Director of Property Management within the Facility Planning and Management section of Defendant CMS's Operations Department, and Executive Director of the Facility Planning and Management section of Defendant CMS's Operations Department is unclear. *See McCullers*, 265 N.C. App. at 223, 828 S.E.2d at 532 ("Defendants argue that their positions are 'created by' [statute], but point to no language in our Constitution or any statute expressly creating their positions."). Their positions are not provided for within the Act and the only references to their respective involvement with CUS are the following allegations from Plaintiffs' amended complaint:

> 31.  From at least 2011 through 2017, [Defendant] Marrero was the manager of [Defendant] CMS's CUS program. Upon information and belief, [Defendant] Marrero's duties as an employee of CMS were to follow [Defendant] CMS policies, regulations, and procedures for the review and approval of applications from CUS participants, including [Defendant] PlaySpanish.  [Defendant] Marrero did not have discretion to vary from those policies, regulations, and procedures.
>
> 32.  Upon information and belief, in at least 2016, 2017, and 2018, [Defendant] Goodman was the Director of Property Management within the Facility Planning and Management section of [Defendant] CMS's Operations Department, and [Defendant] Marrero's direct boss.  Upon further information and belief, [Defendant] Goodman provided oversight for the CUS program, but did not have

discretion to vary from [Defendant] CMS's policies, regulations, and procedures for the review and approval of applications from CUS participants.

33. Upon information and belief, in at least 2016, 2017, and 2018, [Defendant] Hey was the Executive Director of the Facility Planning and Management section of [Defendant] CMS's Operations Department, and [Defendant] Goodman's direct boss. Upon further information and belief, [Defendant] Hey was ultimately responsible for the CUS program, but did not have discretion to vary from [Defendant] CMS's policies, regulations, and procedures for the review and approval of applications from CUS participants.

We cannot hold upon the record developed to this point that Defendants Hey, Goodman, and Marrero are entitled to public official immunity solely because their positions were created by statute. Even if their positions were created by statute, the Act does not expressly provide for delegating power of the approval process to Community Schools Coordinators. It does require school boards to develop policies for approving organizations and volunteers, but then allows Community Schools Advisory Councils—"a committee of citizens organized to advise community school coordinators, administrators, and local boards of education in the involvement of citizens in the educational process and in the use of public school facilities"— to assist in the implementation of those procedures. N.C. Gen. Stat. § § 115C-205(1); -207–08 (2023). Community Schools Coordinators may provide support to Community Schools Advisory Councils pursuant to section 115C-209(1), but it is unclear whether that includes creating approval processes.

Regardless, based on our reading, the Act delegates to school boards and Community Schools Advisory Councils the power to develop and implement an approval process for outside organizations; it does not "expressly create[] the authority to delegate [the] duty" to Defendants Hey, Goodman, or Marrero as needed to satisfy the first *Isenhour* factor. *McCullers*, 265 N.C. App. at 223, 828 S.E.2d at 532. Even if Defendants Hey, Goodman, and Marrero's positions were created by statute, or if they were entitled to exercise a portion of the sovereign power through delegation, they have failed to show their duties are anything more than ministerial.

Plaintiffs adequately pled that Defendants Hey, Goodman, and Marrero are not entitled "to vary from [Defendant] CMS's policies, regulations, and procedures for the review and approval of applications from CUS participants." Defendants have failed to rebut this through the evidence they provided. Specifically, Defendant CMS's regulations for the approval process provide that the Community Use Assistant may deny an application for reasons such as: (1) being incomplete or inaccurate; (2) failing to send an accompanying contract; (3) failing to provide a certificate of insurance if needed; (4) prior violation of rules; (5) unavailability of the requested facilities; or (6) the requested activity, in the opinion of school officials, could cause damage to the facility. We consider these ministerial acts as they are primarily binary decisions based upon the presence of a necessary condition. Thus, we cannot say Defendants Goodman, Hey, and Marrero were required to exercise their "personal deliberation, decision and judgment" in approving CUS applications.

*Isenhour*, 350 N.C. at 610, 517 S.E.2d at 127.

Accordingly, because the record reflects that Defendants Hey, Goodman, and Marrero are public employees and not public officers, they are not entitled to public official immunity. Therefore, we hold the trial court properly denied their 12(b)(6) motion to dismiss Plaintiffs' amended complaint.

## III.    Conclusion

For the aforementioned reasons, we affirm the trial court's order denying Defendant CMS's Rule 12(b)(2) motion to dismiss because of governmental immunity and Defendants Hey, Goodman, and Marrero's 12(b)(6) motion to dismiss because of public official immunity.

AFFIRMED.

Judges STROUD and FLOOD concur.